UNITED STATES *v.* OVERTON & Co. *et al.* (No. 1480).[1]

MANUFACTURES OF PAPER.

A review of the judicial, legislative, and administrative interpretations shows cardboard made of a single layer, if not provided for *eo nomine*, is within the designation "paper," and that articles made of two or more layers of such cardboard are within the designation "manufactures of paper." These goods were properly held dutiable as such under paragraph 420, tariff act of 1909.

## United States Court of Customs Appeals, May 21, 1915.

APPEAL from Board of United States General Appraisers, G. A. 7620 (T. D. 34860). [Affirmed.]

*Bert Hanson*, Assistant Attorney General (*John J. Mulvaney*, special attorney, on the brief), for the United States.

*Curie, Smith & Maxwell* (*Thomas M. Lane*, of counsel; *Herbert M. Wallace*, on the brief), for the appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

These importations were of placards, show cards, or advertising signs composed of cardboard and surface-coated paper. They were assessed for duty by the collector of customs at the port of New York under the provisions of paragraph 411 of the tariff act of 1909, which, in so far as pertinent, reads:

411. Papers with coated surface or surfaces, not specially provided for in this section, five cents per pound; * * * and all other articles composed wholly or in chief value of any of the foregoing papers, not specially provided for in this section, * * * five cents a pound and thirty per centum ad valorem; * * *.

While the protests set forth many claims the importers, both before the Board of General Appraisers and this court, upon appeal, placed their reliance upon paragraph 420 of the act, which reads:

420. Manufactures of paper, or of which paper is the component material of chief value, not specially provided for in this section, thirty-five per centum ad valorem.

---

Of some controlling force in the case are the provisions of paragraph 415, which provides, among other things, *eo nomine* for "cardboard and bristol board."

In its résumé description of the production of the articles it is stated by the board that the material which forms the foundation for each of the signs in question is a cardboard, in some instances entirely plain, while in others it has a surface coating on one side; that superimposed on this cardboard by means of pasting, pressing, and die cutting are one or more thin sheets of surface-coated paper, each sheet usually of a different color; that as each sheet is added the entire sign is placed in a press, where, by the use of dies, certain designs, letters, etc., are cut out of said sheet and pressed upon the face of the sheet immediately under it, producing an embossed effect thereon of contrasted colors; that a separate and similar operation is performed on each sheet of paper thus added to the sign, with the result that there is visible on the face of the completed sign—exclusive of its coated cardboard foundation—only such portions of the differently colored sheets of surface-coated paper as were separately die cut and embossed thereon in each operation. There is no lithographic printing involved in any of the processes employed in the manufacture of these signs.

As to a portion of the merchandise the board made the following finding of fact:

(1) That the show cards or advertising signs covered by the various protests and case numbers set forth in Schedule A (which schedule is hereto annexed and made part hereof) are composed in chief value of either plain or coated cardboard, and we therefore hold such articles to be properly dutiable as manufactures of paper under said paragraph 420. That particular claim in each protest enumerated in said Schedule A is accordingly sustained, but only so far as it covers the show cards or signs contained in the specific cases therein enumerated.

As to other portions it made a different finding, which is not here relevant.

The Government appealed, confining its appeal to the merchandise covered by the above-quoted finding of fact.

The contrasted paragraphs quoted make it evident that while there is an *eo nomine* provision in the act for "cardboard" there is no specific provision in the law for manufactures of cardboard. Much stress is laid by the Government upon the different processes respectively employed in the manufacture of cardboard and paper. Those differences have been expressed by this court in United States *v.* Meyerson (2 Ct. Cust. Appls., 225; T. D. 31953), which it may be well to here repeat.

The goods are manufactured from paper pulp and belong to that class of manufactures from pulp known as cardboard. Cardboard is distinguished from paper as commonly understood in this, that it is thicker and heavier, stiffer and less flexible. Cardboard is not made on the usual paper machine, but on a special machine which

winds up on a cylinder sufficient pulp or several layers of pulp to constitute the thickness required. It is not dried on the cylinders as is paper. Neither is it calendered in the same way. The board is taken from the cylinder wet and is dried in the air, which gives it a stiffness not possessed by paper. Moreover, as it can not be wound on the cylinder without splitting, it is calendered in sheets and not on the roll, as is paper. To make plain board the pulp is run through smooth rollers. Embossed board is produced by passing the pulp between a smooth roller and an indented roller. The testimony further discloses that cardboard is the generic name for paper boards and that in trade and commerce that term embraces the various boards, which, on account of their color and appearance and the pulp material of which they are made, have received such special names as wood board, strawboard, chip board, plain board, red fiber board, embossed-leather board, and so forth. As already stated, the plain board in this case was classified by the collector as *cardboard*, while the embossed board, composed of the same material, manufactured in the same way, intended for the same general uses, and differing in no way from the plain board, except that it had been given the appearance of grain leather with an indented roller, was classified as *paper*. Such a difference in classification may have been moved by considerations of the higher duty, but that classification can scarcely be said to be distinguished by its consistency.

The question recurs, therefore, Under what provision of the law are these importations properly dutiable?

In the absence of an *eo nomine* or some specific provision embracing "cardboard" and like merchandise, the legislative, administrative, and judicial practice seems to have been to regard cardboard and such similar merchandise as pasteboard, press boards, bristol boards, and strawboards, all heavy, thick, subrigid goods, when made of a single layer, as paper, and when made of more than one layer as manufactures of paper regardless of thickness.

Thus the tariff act of 1883 contained no provision *eo nomine* for cardboard, and it was held by the Treasury Department that "certain so-called card middle-board" was dutiable thereunder as "all other paper not specially enumerated or provided for." (T. D. 6632.)

The tariff act of 1890, by paragraph 420 provided in the paper schedule and paragraph for "cardboards," *eo nomine*.

The tariff act of 1894, paragraph 308, likewise provided a similar legislative arrangement.

Under the tariff act of 1894 heavy advertising calendars "nearly one-fourth of an inch thick, surface-coated by the lithographic process, with an advertisement and calendar pasted on the front" were held dutiable as manufactures of which paper was the component material of chief value. G. A. 4043 (T. D. 18730).

The tariff act of 1897 contained no *eo nomine* provision for "cardboard" or similar goods, but did for "paper" (par. 402) and "manufactures of paper" and manufactures "of which paper is the component material of chief value" (par. 407), all "not specially provided for."

In G. A. 4330 (T. D. 20519) white pasteboard or cheap cardboard was held by the Board of General Appraisers dutiable as paper not specially provided for under paragraph 402 of said act. In G. A.

5034 (T. D. 23385) press paper made by running pulp through in one layer of unusual thickness and so known commercially was dutiable as paper not specially provided for under said paragraph 402 of said act. In G. A. 5438 (T. D. 24716) the difference between pressboards of a single layer of pulp and pasteboard of a number of such was pointed out and the latter held a manufacture of and the former paper under said act. The same distinction was observed as to strawboard in Stratton *v.* Olcovich (T. D. 26339), United States Circuit Court, Northern District of California, and G. A. 6091 (T. D. 26557), following the same.

In G. A. 4182 (T. D. 19488) pill boxes "made of cardboard," consisting, of course, of several pieces of such, were held dutiable as "manufactures of paper" under paragraph 407 of said act. In G. A. 5438 (T. D. 24716), cited *supra*, the board approved a previous unpublished decision that an "article made by pasting sheets of paper on the outside of pulp board was not paper such as bristol board or pressboard and dutiable as paper, but is a manufacture of paper." So in Stratton *v.* Olcovich, *supra*, the United States Circuit Court for the Northern District of California held that strawboard "made by pasting or causing to adhere together two or more separate sheets of strawboard after each sheet had been finished in the rollers" was dutiable under said paragraph 407 as manufactures of paper. To the same effect see G. A. 6091 (T. D. 26557) and G. A. 6354 (T. D. 27322). More precisely in point is the case of Knauth *v.* United States (155 Fed., 144; T. D. 28184), United States Circuit Court for the Southern District of New York, wherein it was held that "wall pockets made from cardboard" (several pieces of necessity) "on which lithographic prints have been pasted, being so designed that they can be folded into shape suitable for holding small articles and having pincushions and small calendars attached, were dutiable as manufactures of paper" under paragraph 407 of said act. See also Abstract 22034 (T. D. 30086).

The tariff acts of 1909, paragraph 415, and 1913, paragraph 328, following the long established arrangement of previous tariff acts provided *eo nomine* for cardboard in the proper schedule and paragraphs.

While legislative titles and arrangement are by no means controlling of tariff classification, in doubtful cases they are legitimate indices of the congressional purpose, particularly when, as here, they accord perfectly with the construction put upon the language by the administrative and judicial authorities. In the view of all these accepted exponents of tariff interpretation, from and including the year 1883 to the present, we find no deviation from the uniform judgment that cardboard, as thick and thicker than that herein, made by a single layer, is not provided for *eo nomine*, is within the tariff designation "paper;" and that articles made up of two or more layers or pieces

of such cardboard are within the designation "manufactures of paper." Accordingly we hold these articles so classifiable under the like provisions of paragraph 420 of the act of 1909.

It is claimed, however, that these articles, being in chief value of surface-coated paper, the question is presented whether or not they are more specifically provided for as assessed under the provisions of paragraph 411, *supra*. The Board of General Appraisers held that they were not, and in that view we think were correct. While there would seem to be no answer to the proposition that if they were in chief value of surface-coated cardboard they would, under the considerations already expressed, equally fall within the descriptive terms of paragraph 411, it is to be noted that the provision in that paragraph for manufactures in chief value of paper is confined to manufactures "in chief value of any of the *foregoing* papers." If consideration were to be had solely of the classifying language of paragraph 411 and that of paragraph 415, it could not otherwise than be said, as here claimed by the Government, that this description of cardboard or paper, as we are here treating it, fell within both paragraphs and that, therefore, was as a substance referred to by the words "foregoing papers" as used in the latter part of paragraph 411. But that is not the whole paragraph. The "foregoing papers" referred to in the latter part of paragraph 411 are those which are dutiable at 5 cents per pound, as therein provided. So that the papers of which these articles are made being provided for *eo nomine* in paragraph 415 at 35 per cent ad valorem are not of the "foregoing papers" referred to in the latter part of paragraph 411, but in the tariff sense different articles. The Government in its brief concedes that if these articles were separated into their individual elements they would be included under the provisions of paragraph 415. In their brief (at p. 5) the Government states:

That provision (*paragraph 415*) is undoubtedly a specific reference to this particular form of paper (*i. e., cardboard*) when imported as such, not made up into articles * * *. Parentheses ours.

This construction relates the proviso to paragraph 411 also to paragraph 415 contrary to its express confinement by Congress to the "foregoing" enumerations in paragraph 411.

There is, on reflection, nothing startling about the uniform classification of pasteboard as a paper and manufactures thereof as manufactures of paper, sometimes provided for *eo nomine* as one of the kinds of paper at a particular rate of duty and at other times provided for generally at the same rate and in terms as other classes of paper. The view accords with the material fact that pasteboard is no more nor no less than a heavy, thick paper, possibly of the extreme thickness of the articles so regarded and classed.

These considerations necessarily conduce to the conclusion that the decision of the Board of General Appraisers should be, and it is, *affirmed*.