(C. D. 493)

GEO. M. GRAVES CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 8, 1941)

*Strauss & Hedges; Barnes, Richardson & Colburn* (*Hadley S. King* of counsel) for the plaintiff.

*Charles D. Lawrence,* Acting Assistant Attorney General (*Joseph E. Weil,* special attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: These are suits against the United States, arising at the port of Boston, brought to recover certain customs duties alleged to have been improperly exacted on particular importations of Fourdrinier wire screens of 25-mesh for use in Fourdrinier machines. Duty was levied thereon at the rate of 75 per centum ad valorem under paragraph 318 of the Tariff Act of 1930, as modified by the Presidential Proclamation promulgated in T. D. 44745, 59 Treas. Dec. 701, which increased the original tariff rate of duty under said paragraph from 50 to 75 per centum ad valorem applicable to "Fourdrinier wires suitable for use in paper making machines." It is claimed that said articles are properly dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of said act as parts of machines not specially provided for.

At the first hearing, held at Boston on December 9, 1940, before Brown, Judge, a representative sample of a portion of the imported merchandise was admitted in evidence herein as exhibit 1. In addition, the plaintiff offered in evidence the testimony of two witnesses. The first, A. G. MacIntyre, a qualified chemical engineer in the paper industry since 1912, testified that he had designed, built, and managed five paper mills in the United States and Canada; that he was at one time the head of the Forests Products Laboratory, the technical laboratory of the paper industry in this country and Canada; that he had been in every paper mill in the United States; and that he was a charter member of the Technical Association of the Paper and Pulp Industry, which has to do with establishing standards for the paper industry in the United States.

After explaining the function of a Fourdrinier machine and of Fourdrinier wire screens as parts of such machines, the witness testified in part as follows:

Q. Do you know what is meant by 25 mesh Fourdrinier wire?—A. Yes.

Q. What does that mean?—A. The meshes are the same as wire cloth.

Q. 25 apertures to the inch?—A. Yes.

Q. Do you know what "single twisted" means?—A. Yes.

Q. What does that mean?—A. As against straight wire meshed or woven, you may weave it with a twisted wire.

\* \* \* \* \* \* \*

Q. I show you Exhibit 1 in this case. Does that meet your description of 25 mesh single twisted?—A. It is approximately 25 I would say, and it is single twisted.

Q. Would a machine fitted with Fourdrinier wire of that particular mesh, would that be suitable for paper making?—A. No.

\* \* \* \* \* \* \*

Q. Did you ever see 25 mesh Fourdrinier wire used to make paper?—A. Not to make paper, no.

Q. What do you make with Fourdrinier wire of that particular mesh?—A. We make felt. \* \* \*.

\* \* \* \* \* \* \*

Q. I show you Illustrative Exhibit B, in Protest 642624–G of this Court, which by incorporation became part of Suit 4150, and was decided by the Court of Customs and Patent Appeals in Customs Appeal Decision No. 8, and ask you to examine that sample.—A. Yes, sir.

Q. I think the record showed that was 28 mesh, was supposed to represent 28 mesh wire. After examining that Exhibit, and Exhibit 1 in this case, from your knowledge of these articles as to their construction, and as to their size, and as to their use, would you say they are similar?—A. Oh yes. There is a little difference in the twist.

Q. In other words, one would be used in the same place as the other, and one would be not used in any place where the other could not, is that right?—A. That is right.

On cross-examination the witness testified in part as follows:

X Q. Did you have an opportunity to observe the manufacture of the roofing paper?—A. Yes.

X Q. Did you see what mesh wire they used?—A. Yes, sir.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. What mesh did they use?—A. 25 mesh, in making roofing felt.

X Q. I asked you did you ever see roofing paper manufactured? Yes or no?—A. Yes, sir, but not on the Fourdrinier——

X Q. What?—A. Not on the Fourdrinier machine.

X Q. You have never seen roofing paper made on a Fourdrinier machine?—A. That is right.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Am I correct in understanding that you distinguish between roofing paper and roofing felt, in that roofing paper is further processed, and manufactured from roofing felt, is that correct?—A. Yes, sir.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Now I referred a few moments ago to the Dictionary of Paper, published under the auspices of the American Paper and Pulp Association, and I believe you told me you considered it an authority. Will you please look at the definition of Fourdrinier Wire, directing your attention particularly to that part which reference is made to roofing, insulating and wrapping papers? What does that disclose as the various meshes of Fourdrinier wires used in the manufacture of roofing, insulating and wrapping papers?—A. 18 to 70.

X Q. Mesh?—A. Yes.

On redirect examination the witness testified in part as follows:

R. Q. Is that statement accurate Mr. MacIntyre, in your experience?—A. It is accurate, but it needs some qualification. They do not mean you can take any of these papers, and use only 18 to 70 wires. Taking the roofing paper, you use a 25 mesh. You might use a coarse wrapping, that does not have any of the required things, such as color, sizing, etc. You could use such a coarse wire for that, but it is a mat.

R. Q. That is not strictly a paper?—A. No, that is a matting. \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

R. Q. Getting back to Exhibit 1, could you make paper from wire of that type?—A. No, not paper.

R. Q. You spoke about felt?—A. Yes, you could make felt.

R. Q. Is felt, paper?—A. No, no more than I was going to say any more than chicken wire is not a sheet of steel; felt is not paper.

On recross-examination the witness testified in part as follows:

R. X Q. So technically and strictly speaking, whether you use 70 mesh or 10 mesh, you have not got paper at the end of the Fourdrinier machine?—A. No, but you have something that will make paper.

R. X Q. But it is not paper when it leaves the Fourdrinier machine, it is not paper at that time?—A. That is right.

The second witness, Rexford H. Salisbury, assistant superintendent in the employ of Bird & Son of East Walpole, Mass., manufacturers of various kinds of felt, testified in part as follows:

Q. You stated Mr. Salisbury, you had observed the operations in your East Walpole Plant?—A. I have.

Q. Have you seen them make paper in that plant?—A. I have.

Q. With the use of Fourdrinier wires?—A. Yes, sir.

Q. Did they use a wire similar to Exhibit 1?—A. I never saw such a wire used.

Q. To make paper?—A. To make paper.

Q. What sort of wire did they use?—A. They used a wire they called a 40 or 50 mesh. I say 40 or 50, because they use different sizes.

Q. But 40 would be the coarsest wire you had seen them use, is that correct?—A. That is correct.

Q. From your experience in your particular Company, would you say Exhibit 1 is used to make paper or not?

 *  *  *  ⁂  *  *  *

The WITNESS. It is not.

Q. I show you Illustrative Exhibit B, which was the merchandise involved in Protest 642624–G, which by incorporation became Suit 4150, and was decided by the Court of Customs and Patent Appeals, in C. A. D. 8. Will you examine Illustrative Exhibit B, in Suit 4150, and compare it with Exhibit 1 in the case before the court this morning? For your information Mr. Salisbury, Illustrative Exhibit B, is supposed to be a * * * 28 mesh— * * *—A. They are similar, except Exhibit B is double twisted, instead of single twisted.

 *  *  *  *  *  *  *

Q. Does that make any difference as to their use?—A. We have used both.

 *  *  *  *  *  *  *

Q. It has the same use?—A. Same use as far as the making of felt goes.

On cross-examination the witness testified in part as follows:

X Q. Does your firm sell roofing paper?—A. They do.

X Q. From which plant?—A. East Walpole.

 *  *  *  *  *  *  *

X Q. Did they use wires similar to Illustrative Exhibit B, in Suit 4150, and Exhibit 1, in the present suit in the manufacture of roofing paper?—A. No.

X Q. What was the difference in the wire they used there?—A. They used a finer wire, such as No. 40, or 50.

 *  *  *  *  *  *  *

X Q. Did you ever hear of the dictionary of the paper industry published under the auspices and direction of the American Paper and Pulp Association?—A. I have heard of it, yes, sir.

X Q. Is it recognized as an authority?—A. It is.

X Q. In the paper industry?—A. In the paper industry.

 *  *  *  *  *  *  *

X Q. Do you agree with the definition on page 170 of the book, wherein it is stated that the following are the meshes generally used: "pulp 18 to 40?"—A. That is possible, yes.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. "Cardboard 40 to 60; Roofing, insulating and wrapping paper 18 to 70." Do you agree with that?—A. I never heard of a wrapping paper made on such a coarse wire. I do not see how it is possible.

X Q. You do not see how it is possible?—A. No, sir.

On redirect examination the witness testified as follows:

R Q. Did you ever hear of roofing paper being made on such a coarse wire?—A. As 18?

R Q. Yes.—A. I never did, no.

R Q. Your Company, Bird & Sons, are they one of the large factors in your particular business in the United States?—A. They have been the largest. At present I think there are 2 or 3 larger making roofing felt.

R Q. So you run third or fourth at the present time?—A. Yes.

At the conclusion of the testimony, counsel for the plaintiff moved to incorporate the record in the case of *United States* v. *Geo. S. Bush & Co., Inc., et al.*, 26 C. C. P. A. 145; C. A. D. 8. Counsel for the government, however, objected on the ground that the plaintiff was different and the merchandise not identical. The trial judge reserved decision on the motion for the full division, namely, Division Two of this court.

At the second hearing, held at New York on December 9, 1940, before this division, counsel for the plaintiff renewed his motion to incorporate, and, counsel for the government withdrawing all objections, the record in the cited case was incorporated herein.

The government then proceeded to call as a witness W. G. Mac-Naughton, an engineer in the employ of the Newsprint Service Bureau of the Association of Newsprint Manufacturers of the United States, who testified that previous to holding his present position he had served as Secretary of the Technical Association of the Pulp and Paper Industry for 6 years; and that he was familiar with Fourdrinier wires. He further testified in part as follows:

Q. I show you Plaintiff's Exhibit 1, which represents the merchandise in the instant case, and ask you whether or not you have had any experience in the use of similar wire?—A. Not with that construction.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. Please look at Illustrative Exhibit B in Suit 4150 \* \* \*. Tell me whether you have ever had occasion to use wire similar to that.—A. Not in the grades of paper I made.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. Have you had occasion to see wire similar to Illustrative Exhibit B in Suit 4150, or Plaintiff's Exhibit 1, in use?—A. I can't say that I have ever seen them in use, \* \* \*.

Q. Have you ever had occasion to manufacture roofing felt or roofing paper?—A. Never have manufactured it.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. Have you had occasion to observe its manufacture a great number of times?—A. Three or four times.

\* \* \* \* \* \* \*

Q. And what did you do to familiarize yourself with roofing felt and roofing paper?—A. Listening to discussions on the subject, reading the technical literature on the subject, and in consideration of the establishment of definitions.

\* \* \* \* \* \* \*

Q. Please describe what roofing felt is, or what it looks like, if you know.

Mr. KING. That is objected to.

Judge DALLINGER. Overruled.

Mr. KING. Exception.

By Judge DALLINGER.

Q. You have seen it many times?—A. Yes.

By Mr. WEIL.

Q. What does it look like?—A. It is a soft, porous, matted sheet of paper.

Mr. KING. I object to that; the same objection.

Judge DALLINGER. That last part may be stricken. You asked him what it looks like; he said "paper." That part may be stricken.

The WITNESS. Well, it looks like the material used under carpets to minimize the sound in walking over a carpet on a bare floor.

\* \* \* \* \* \* \*

By Judge DALLINGER.

Q. Is it as thick as a mat?—A. It is thicker than a thin mat, but it is the same thickness as many blotting papers.

\* \* \* \* \* \* \*

By Mr. WEIL.

\* \* \* \* \* \* \*

Q. Now, would you say, from your experience, that roofing felt is paper?

\* \* \* \* \* \* \*

The WITNESS. Roofing felt is a paper, from a manufacturing standpoint.

Q. Do you agree with the definition on page 282 of the "Dictionary of Paper" wherein roofing felt is defined as: "A very porous, soft paper, made largely from the lowest grades of old cotton and woolen rags and some old paper stock, the quality depending on the nature and quantity of rags used. \* \* \* Do you agree with that part of the definition?—A. I do.

On cross-examination the witness testified in part as follows:

X Q. I show you illustrative Exhibit A in suit 4150 (handing to witness), and ask you if that is a soft, porous, matted sheet?

Mr. WEIL. That is objected to until it is first shown it is roofing felt.

Judge DALLINGER. Objection overruled.

Mr. WEIL. Exception.

The WITNESS. It is a paper.

\* \* \* \* \* \* \*

X Q. Don't you recognize that as paper pulp?—A. No.

X Q. Have you ever made pulp?—A. Yes, sir.

X Q. Have you ever seen it made?—A. Yes, sir.

X Q. And you don't recognize that as pulp?—A. It may be pulp, but it is also a paper.

X Q. So, in your mind, you don't distinguish?—A. Generically it is paper.

X Q. You don't distinguish between paper pulp, wallboard pulp or felt?—A. Not in generic meaning, provided the pulp is a relatively thin, uniform sheet.

The witness then testified that he was familiar with paperboard, wallboard, pulpboard, and cardboard, and that he considered them all paper. He then testified in part as follows:

The WITNESS. I would say that where the material conforms to the definition of paper, in that it is composed of fibrous material formed into a matted sheet from a water suspension, it is paper.

X Q. So, in your mind, you make no distinction, then, between pulp and paper?—A. Except in the form. If the pulp comes out in bales, it wouldn't be paper, but this is made in a paper machine. * * *.

By Judge DALLINGER.

Q. How do you know it had been made in a paper machine?—A. You can see it.

Q. Don't you make any distinction between a paper and a pulp-making machine?—A. A pulp-making machine? Pulp-making is a form of paper-making machine.

*       *       *       *       *       *       *

By Mr. WEIL.

X Q. There is a difference between roofing paper and felt, isn't there?—A. A very, very indistinct difference.

X Q. But they are distinguishable?—A. Roofing paper, that term, I understand, is applied to roofing felt which has been saturated with asphalt, that is in a more or less finished form for applying to roofs.

*       *       *       *       *       *       *

X Q. Are you the Mr. McNaughton who testified in this court several weeks ago in a paper mill equipment case involving a so-called cylinder wire, involving Kamyr wire?—A. Yes, sir.

*       *       *       *       *       *       *

X Q. Do you recall the merchandise involved in that case?—A. Yes, sir.

X Q. What was it?—A. Wire cloth, cable cloth.

*       *       *       *       *       *       *

X Q. * * *. On page 83 of the record Judge Dallinger asked you: "This was the first time you ever made any test of a wire netting of this kind, this size?" And you answered, "That is right." Is that correct?—A. Yes, sir.

X Q. The court further asked you: "Have you ever manufactured any paper, or seen any paper manufactured, on a mesh of that size?" And you answered, "No, I have not." Is that correct?—A. Yes, sir.

X Q. And that was 28-mesh?—A. Yes, sir.

*       *       *       *       *       *       *

X Q. But you have never practically made paper on a 25-mesh Fourdrinier wire?—A. I have never made paper on any cable wire, on any cable, twisted wire.

On redirect examination the witness testified in part as follows:

R. Q. Did you testify on cross-examination by Mr. King how they changed or converted roofing paper from roofing felt?—A. I believe so.

*       *       *       *       *       *       *

R. Q. Am I correct in understanding they add slate or asphalt?—A. I didn't say that. Roofing paper is made from roofing felt by taking rough felt through a bath of asphalt. * * *.

R. Q. Do they put this roofing felt on a Fourdrinier machine to make roofing paper?—A. No.

It appears that the question of the dutiable classification of merchandise substantially similar to that here under consideration was before this court in the ·case of *Geo. S. Bush & Co., Inc.* v. *United States,* T. D. 48138, 69 Treas. Dec. 251. In that case we held that certain Fourdrinier wire screens having 28 meshes or openings per lineal inch, being parts of pulp making machines and not suitable for use in paper making machines, were excluded from the provisions of paragraph 318 of the Tariff Act of 1930 for "Fourdrinier wires and cylinder wires, suitable for use in paper making machines," and therefore were properly dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of the Tariff Act of 1930 as parts of machines not specially provided for, there .being no specific provision for parts of pulp making machines. After reviewing somewhat at length the Congressional history of said paragraph 318, we said, among other things:

. , * * *. Fourdrinier wire screens suitable for use in other than paper-making machines are excluded from said paragraph. *Expressio unius est exclusio alterius.* Among such excluded Fourdrinier wire screens must be included those used in pulp making. Apparently an effort was made to have the paragraph include such screens, but evidently Congress did not see fit to do so.

*   *   *   *   *   *   *

Throughout the proceedings there is no indication that Fourdrinier wire screen of the kind employed in making pulp, where the number of meshes per lineal inch is as low as 28 was being considered. If that class of wire screen was contemplated is it not fair to assume that Congress would have made the provision for Fourdrinier wires cover those "suitable for use in pulp and paper-making machines," as it did in the present paragraph 356 in dealing with "stock-treating parts for pulp and paper machinery?" This court may not read into said paragraph 318 words which the Congress failed to insert therein.

That decision of this court was never appealed from.

Later, the same issue was raised in the case of *Geo. S. Bush & Co., Inc., et al.* v. *United States,* T. D. 49211, 72 Treas. Dec. 441. In that case we again held that Fourdrinier wire screens having but 28 meshes to the inch were not "suitable for use in paper making machines" within the meaning of paragraph 318 of the Tariff Act of 1930, but were properly dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of said act as parts of machines not specially provided for. In that case, after referring to our previous decision in *Bush* v. *United States, supra,* we said:

Counsel for the Government, in his brief, insists that pulp is paper and should be so treated for tariff purposes. He cites, in support of such contention, the case. of *United States* v. *Overton & Co.,* 6 Ct. Cust. Appls. 248, T. D. 35474. The only rule there laid down was that in the absence of a provision for manufactures of cardboard such articles should be held to be manufactures of paper not specially provided for. On the contrary, the court specifically pointed out the technical difference between cardboard and paper in the following language:

The contrasted paragraphs quoted make it evident that while there is an *eo nomine* provision in the act for "cardboard" there is no specific provision in the

law for manufactures of cardboard. Much stress is laid by the Government upon the different processes respectively employed in the manufacture of cardboard and paper. Those differences have been expressed by this court in *United States* v. *Meyerson* (2 Ct. Cust. Appls. 225; T. D. 31953), which it may be well to here repeat.

The goods are manufactured from paper pulp and belong to that class of manufactures from pulp known as cardboard. Cardboard is distinguished from paper as commonly understood in this, that it is thicker and heavier, stiffer and less flexible. Cardboard is not made on the usual paper machine, but on a special machine which winds up on a cylinder sufficient pulp or several layers of pulp to constitute the thickness required. It is not dried on the cylinders as is paper. Neither is it calendered in the same way. The board is taken from the cylinder wet and is dried in the air, which gives it a stiffness not possessed by paper. Moreover, as it can not be wound on the cylinder without splitting, it is calendered in sheets and not on the roll, as is paper. To make plain board the pulp is run through smooth rollers. Embossed board is produced by passing the pulp between a smooth roller and an indented roller. * * *

We have carefully examined all the evidence submitted herein and we see no reason for not adhering to our former decision in *Bush* v. *United States, supra*, wherein we excluded similar merchandise from the provision in paragraph 318 of the Tariff Act of 1930.

The decision last quoted from was affirmed by the United States Court of Customs and Patent Appeals in *United States* v. *Geo. S. Bush & Co., Inc., et al.*, 26 C. C. P. A. 145, C. A. D. 8. In the course of its decision the appellate court, among other things, said:

It is perfectly clear from all the pertinent testimony that wire such as that at issue is not actually used, nor can it be used, in making paper as the term "paper" is commonly understood, because the meshes are too large. * * *

* * * * * * *

Another contention of Government counsel is that pulp board made with a 28-mesh wire on a Fourdrinier machine is *paper*. One of the witnesses for importer in the *Bush & Co.* case, *supra*, stated that the wire could be used in making coarse fiber board (similar to the sample introduced as illustrative of "pulp stock") and building board. These the Government contends are heavy papers, and cites the case of *United States* v. *Overton & Co.*, 6 Ct. Cust. Appls. 248, T. D. 35474, where, in a case arising under the 1913 tariff act, this court held certain merchandise described in the opinion as "placards, show cards, or advertising signs composed of cardboard and surface-coated paper" classifiable under paragraph 420 of that act as manufactures of paper.

The appellate court then proceeded to point out that the case cited by government counsel had no application to the merchandise there under consideration.

In the instant case it having been clearly proved that the merchandise involved herein is similar in all material respects to that which was before the appellate court in the case just cited, and all the evidence therein being before us in the present record, the only question that arises is whether any new evidence has been introduced herein to warrant us in reaching a different conclusion from that arrived at in the cited and incorporated case.

Both of the thoroughly qualified witnesses for the plaintiff herein have testified that a 25-mesh Fourdrinier wire was not suitable for making paper. On cross-examination counsel for the government attempted to bring out the fact that so-called roofing paper could be made on a 25-mesh Fourdrinier wire, and for that purpose counsel read to the witnesses a statement in a publication entitled "Dictionary of Paper" published by the American Paper and Pulp Association (which publication was not offered in evidence) to the effect that so-called roofing, insulating and wrapping papers could be made with the use of screens ranging from 18 to 70 meshes. Both witnesses for the plaintiff distinguished between roofing paper and roofing felt; and the second witness, Salisbury, clearly stated on cross-examination that in making roofing paper a Fourdrinier wire of a finer mesh, namely, between 40 and 50 is used.

The government's only witness, W. G. MacNaughton, while undoubtedly qualified as an expert in the manufacture of newsprint, admitted in his direct examination that he had had no experience with Fourdrinier wire such as that involved in the instant case, and had never manufactured roofing felt or roofing paper. In our opinion, therefore, his testimony cannot be considered of equal weight with that of the two expert witnesses who appeared for the plaintiff. On cross-examination, being shown illustrative exhibit A in the incorporated case (Suit 4150) which was admitted as a sample of pulp, MacNaughton testified that although the sample might be pulp it was also paper; and that in his opinion paperboard, wallboard, pulpboard and cardboard were all paper, although the Congress in paragraphs 1401 and 1402 has clearly differentiated between said boards and paper. This distinction is emphasized in the proviso to paragraph 1402 which reads: "*Provided,* That for the purposes of this act any of the foregoing less than twelve one-thousandths of 1 inch in thickness shall be deemed to be paper."

The witness MacNaughton also admitted on cross-examination that he had testified in a previous case in the court (protest 929564–G) that he and his associates had experimented with a wire of 28-mesh and found that paper could not be made with such a sized mesh as a commercial proposition. Moreover, in answer to a question by the court as to whether he had ever manufactured or had seen any paper manufactured on a machine using that sized mesh, he answered "no." In this connection it is to be noted that a 28-mesh wire is finer than the one of 25-mesh involved herein. It is manifest that this testimony corroborates instead of contradicts the testimony of the witness for the plaintiff.

Upon the entire record we find as a fact and hold as a matter of law that the Fourdrinier wire constituting the imported merchandise at bar, which has 25 meshes to the lineal inch, is not suitable for use in

paper-making machines, and that it is therefore excluded from the provisions of paragraph 318 of the Tariff Act of 1930. Accordingly, we follow the decision of the appellate court in *United States* v. *Geo. S. Bush & Co., Inc., et al.*, 26 C. C. P. A. 145, C. A. D. 8, and hold said wire screens to be properly dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of said act as parts of machines not specially provided for, as claimed by the plaintiff. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.