**F. W. MYERS & CO., Inc.**

v.

**UNITED STATES.**

**C.D. 3083; Protest Nos. 63/22283–3333.**

United States Customs Court,
Second Division.

Aug. 14, 1967.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, Earl R. Lidstrom, Chicago, Ill., and Richard C. Meade, New York City, of counsel), for plaintiff.

Carl Eardley, Acting Asst. Atty. Gen. (Richard J. Kaplan and Alfred A. Taylor, Jr., New York City), trial attorneys, for defendant.

Before RAO, C. J., and FORD and LANDIS, JJ.

LANDIS, Judge.

Plaintiff protests the duties assessed on stainless steel wire screen trucked from Canada and entered at Champlain, N. Y., in sizes 10 mesh and 50 mesh, 108 by 164 inches; 10 mesh, 108 by 126 inches, and 50 mesh, 109 by 167 inches. Mesh denotes the sizes of the screen openings measured by the number of wires per lineal inch in the warp. Warp, for purposes here, is the wire which runs the length of the screen. The 108 and 109 recited above are warp measurements. Weft (also called the shute or face) is the wire that runs across the warp. It measures the width of the screen. The 164, 126, and 167 recited above are weft measurements.

The collector classified the screen as "cylinder wire, suitable for use in papermaking machines, not having more than 55 meshes per lineal inch in warp or filling," dutiable at 35 per centum ad valorem under paragraph 318 of the Tariff Act of 1930, as modified. He also assessed so-called additional duties on the iron and steel content of the wire, as provided in paragraph 305, on all articles dutiable under paragraph 318. The latter assessment is affected only if we find the screens are not properly dutiable under paragraph 318.

Plaintiff claims that these screens are not suitable for use in paper making machines and should be dutiable either under paragraph 372 as parts of machines, or paragraph 318, as screen, or paragraph 353, as parts of an article having as an essential feature an electrical element. The claim under paragraph 353 has not been seriously pressed or argued.

The relevant statutory provisions are as follows:

Paragraph 318, Tariff Act of 1930, as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, T.D. 52373:

Cylinder wires, suitable for use in papermaking machines (whether or not parts of or fitted or attached to such machines), and woven-wire cloth suitable for use in the manufacture of Fourdrinier wires or cylinder wires:

\* \* \* \* \* \* \*

Other ................................... 35% ad val.

Paragraph 372, Tariff Act of 1930, as modified by the Sixth Protocol to the General Agreement on Tariffs and Trade, T.D. 54108:

Machines, finished or unfinished, not specially provided for:

\* \* \* \* \* \* \*

Accounting machines, bakery machines, calculating machines \* \* \*

\* \* \* \* \* \* \*

Other \* \* \* .......................... 12% ad val. [or] 11½% ad val. [Rate applicable is dependent upon date of entry.]

Parts, not specially provided for, wholly or in chief value of metal or porcelain, of any article provided for in any item 372 in this Part. The rate for the article of which they are parts.

Paragraph 318, Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802:

Woven-wire cloth: Gauze, fabric, or screen, made of wire composed of steel, brass, copper, bronze, or any other metal or alloy, not specially provided for:

With meshes not finer than thirty wires to the lineal inch in warp or filling .............. ¾¢ per sq. ft., but not less than 10% nor more than 20% ad val.

Paragraph 318, Tariff Act of 1930, as modified by the sixth protocol, T.D. 54108:

Woven-wire cloth: Gauze, fabric, or screen, made of
wire composed of steel, brass, copper, bronze, or
any other metal or alloy, not specially provided for,
with meshes finer than 30 but not finer than 90
wires to the lineal inch in warp or filling ................ 2.25¢ per sq. ft.
[or]
2.125¢ per sq. ft.,
but not less than
10% nor more
than 20% ad val.
[Rate applicable
is dependent upon
date of entry.]

On trial, plaintiff adduced the testimony of three witnesses. Defendant produced one witness. Samples of 10-mesh screen (exhibit 1) and 50-mesh screen (exhibits 2, A, and B) are in evidence. Exhibits 3, 4, and 5 are probative of how the imported screen is used in a pipemaking Transite plant. Before getting into how the screen was actually used, we review the record to determine whether these screens are suitable for use in papermaking machines, as found by the collector.

William Arthur Leatherbarrow, production manager, Johnson Wire Works, Ltd. (hereinafter referred to as Johnson, Ltd.), Montreal, Canada, testified for plaintiff. He has been with Johnson, Ltd., 41 years, the last 20 years as production manager in its principal business of making wire screens primarily for paper mills. Mr. Leatherbarrow stated that, incident to his work, he visits paper mills and has been doing so for 18 years. He was, he said, personally familiar with the equipment used in, and had observed the processes which go into papermaking.

Addressing his testimony to exhibits 1 and 2, Mr. Leatherbarrow testified that, with respect to the 10- and 50-mesh screens, the warp wire, which is crimped and finer than the weft wire, is designed to go around the circumference of a cylinder. The heavier, weft wire, has little or no crimp in it. The warp of 108 or 109 inches in the imported screens, according to Mr. Leatherbarrow, is not long enough to wrap itself around a papermaking cylinder mold. He stated that to run the heavier weft wire around the cylinder would be difficult, distort the screen, and the pressure on the heavier weft wire, when the cylinder was in use, would crush the finer warp wire. Johnson, Ltd., according to Mr. Leatherbarrow, has never sold screen, in the imported sizes, to papermaking mills.

On cross-examination, Mr. Leatherbarrow testified that Johnson, Ltd., mesh screen is manufactured to customer specifications which can differ from one customer to the next. He stated that the only acceptable way for the warp wire to run in the papermaking industry is around the cylinder circumference, although the circumference dimensions as such may vary from mill to mill. He could not recall one Johnson, Ltd., sale to a paper mill of a screen approximately 108 inches in warp, but admitted that Johnson, Ltd., did not sell wire screens to papermakers in the United States.

Mr. Felix Gleason, called by plaintiff, is employed by the Johns-Manville Corp. as superintendent of its papermaking mill in Manville, New Jersey. At the time he testified, he had been with the company 16 years, 15 as superintendent. He received his bachelor's degree in

Chemical Engineering from the University of Minnesota in 1938; worked 2 years as a quality control supervisor for United States Gypsum, manufacturers of insulating board, a process which used cylinder molds "as such" (R. 49), and 5 years with Bird & Son, East Walpole, Mass., manufacturers of roofing paper and insulating board. He is a member of the Technical Association of Pulp & Paper Industry and had been since 1945.

He testified that he was responsible for the paper products produced by Johns-Manville Corp. for the building construction industry. Production is his business and he had visted and observed papermaking operations in various mills. Mr. Gleason was, he said, familiar with the kinds of wire screen used in papermaking.

Examining exhibit 1, 108 in warp, Mr. Gleason stated that he could not use it on a papermaking cylinder because the crimped warp wire must wrap itself around the cylinder and, for this, the minimal dimension is a 114 warp. The cylinder, he said, must be completely covered by the warp wires in order for the two edges to be uniformly sewed without any opening. The cylinders used by Johns-Manville Corp., said Mr. Gleason, are in sizes "conventional in the trade" and, in this connection, a 114 warp is the minimal dimension for cylinders used in papermaking. He explained that the warp crimped wire locks the weft wire as the weft is set between alternate wires, both on top and underneath. Mr. Gleason further stated that, if the straight weft wires were wrapped around the cylinder, it would pull apart when sewed because there would be nothing to hold it in place as the crimped wire does when it is sewed. He stated that he could not use weft wire of any size around the circumference of a cylinder. Mr. Gleason also testified that normally screens used in papermaking are always longer in warp than in weft and it would not be practical to adjust the imported screen sizes for use in papermaking, since you would have to wrap the weft wire around the

circumference which "would be impossible" (R. 56).

On cross-examination, Mr. Gleason admitted that, if there were a cylinder which would accept a 108 warp screen around its circumference, the 108 warp could be used, but qualified this admission with testimony that there are none such within the standard size cylinders used in papermaking. In his experience, Mr. Gleason stated that he has never known of a cylinder used in papermaking to take a screen smaller than 114 warp. Sewing is only one method of attaching the screens to their cylinders. Another method, said Mr. Gleason, is soldering in which case a weft wire is removed and replaced with soldering wires which melted, flow and weld the ends of the wire together. In this method, care must be taken not to fill any of the mesh openings, otherwise the water will not drain and the paper sheet will be discontinuous. He had never heard of the weft being wrapped around a cylinder and successfully welded. The only reason it could not be done, so far as he knew, was the difficulty of welding stainless steel.

Mr. Gleason testified that he had discussed using the weft to go around a cylinder with other people in the papermaking industry and their comment was that "it can't be done * * * the wire will not hold." (R. 65.)

Defendant adduced the testimony of Mr. Robert Stern, vice president and director of sales for Multi-Metal Wire Cloth, Inc., a manufacturer of industrial wire cloth and paper mill grade wire cloth. The record shows that Mr. Stern is a graduate of the University of Pennsylvania with a degree in chemistry; that he also had a year of chemical engineering study; that he went full time with Multi-Metal Wire Cloth, Inc., in 1938 as an industrial sales representative; that he has served as vice president and director of sales for 15 years, and, while serving in these various capacities, he visited papermaking plants in every area of the United States, north, south. east, and west, where there is

a paper or pulp producing industry. He also is a member of the Technical Association of the Pulp & Paper Industry, as well as the Paper Industry Management Association.

Mr. Stern examined exhibit 2 and confirmed that it is a sample of 50-mesh wire screen with approximately 35 wires per inch in the weft direction. His company sells wire of the same general arrangement, that is, with more wires in the warp direction than in the weft direction, but it had never sold wire screen exactly like exhibit 2, which he denoted a special 50-mesh count having less than the nominal 40 number of wires per inch in the weft direction. His company sells nominal 50-mesh cylinder grade screen, which runs 50 wires in the warp and 40 wires in the weft direction and, while those specifications can vary somewhat, generally they do not. Mr. Stern stated that his company has never gotten into material like exhibit 2, measuring 50 warp wires and 35 weft wires,

* * * for the simple reason that we have never gotten into a position of doing business with the specific mills that use this type of construction. This is a definite specification that is designed to meet a specific need for a specific type of equipment, namely, a cylinder, as I gather it is a cylinder machine—cylinder mold machine— which is used specifically for the purpose of making something in the line of Transite pipe, Transite board, something of that sort of an asbestos grade material, and my company has never done business with the companies engaged in that field using that specific grade of material. * * *

He testified that normal 50 by 40 mesh is used with vacuum cylinder washing equipment in preparation of pulp and on cylinder mold machines in the preparation of paper sheets. Mr. Stern believed that exhibit 2 could be used the same as the 50 by 40 mesh but, when asked if it is so used, admitted he could not answer from "specific personal experience." (R. 83.)

It is usual, said Mr. Stern, for the warp crimped wire to run in the circumferential direction of the cylinder. He did not know any specific reason why the weft could not be used around the circumference except "the operators might prefer not to apply it in that direction." (R. 85.)

Mr. Stern confirmed that the only two methods used to attach a screen to a cylinder were by soldering or sewing. Asked if there was any reason why exhibit 2, 108 by 164, could not be applied to a cylinder mold with the weft wire running circumferentially, Mr. Stern replied, "I know of no reason why it couldn't be. *If you mean this in an absolute sense that it could not be applied, I don't know of any reason why it could not be.*" (R. 86), [emphasis added]. The weft, he said, could be attached circumferentially by either soldering or sewing. When asked if the weft wire attached around the circumference would be usable on the mold in the manufacture of paper, Mr. Stern said:

If you mean by that that it could contribute some useful—on some location in a cylinder mold machine, could contribute some useful function in the manufacture of a salable sheet, yes, I believe it could be used. [R. 87.]

Mr. Stern knew of only one specific instance, in 1955, when a screen with weft wires running circumferentially was attached to a cylinder mold and used in the manufacture of paper. He agreed that generally, the latter does not happen for several reasons: the first having to do with the operation of the cylinder equipment itself, it does not perform as well; the second, mechanical reasons, it is easier to attach the screen with the warp wire around the cylinder, the screen being more flexible in the warp direction and easier to seam; also, the screen is less likely to stretch or loosen with the warp wire around the cylinder. In this connection, Mr. Stern testified that the warp wire around the cylinder was the preferred method.

Mr. Stern, questioned closely on his testimony that his company manufac-

tured screens in a range of circumference dimensions approximately 100 inch to 150 inch in warp, said that the 100 inch would probably be appropriate for a cylinder somewhat smaller than 36 inches; that the "cylinders are generally filled in from a length of, say, 3 feet, 36-inch diameter, 40-inch diameter, 42 inch, 48 inch"; that his company also sold screens of 108 inches in warp, that 3-foot diameter was approximately 108 inches, "possibly a little more than that * * * it could be more than 108" (R. 95, 96), possibly as much as 113, though he could not recall from memory, without figuring out the calculation—the point being, Mr. Stern said, "that a cover for a cylinder of 36-inch diameter could be sold as much as 113 inches, depending on the manner in which the mill is accustomed to ordering covers [screens], allowing for overlap, trim." (R. 96.)

That these screens are a kind of cylinder wire, described in paragraph 318, is not in dispute. The cylinder wires of paragraph 318 are, however, such as are "suitable for use in paper-making machines." Defendants argues that, on the facts of record, plaintiff has failed to make a *prima facie* showing that the screens are not so suitable. Short of this, and considering plaintiff's alternative claims, defendant would concede the claim under paragraph 318 as "screen," contending it is a relatively more specific provision than "parts of machines, not specially provided for," as ·plaintiff claims under paragraph 372. Plaintiff relies on the facts and legal precedent to support its argument that the screens are not suitable for use in papermaking machines and are properly dutiable under paragraph 372.· Going back to the initial question, we find that these screens, 10 mesh and 50 mesh, are not suitable for use in papermaking machines.

◼ We start with the point that in the parlance of customs law suitable for use means "actually, practically, and commercially fit for such use." Kahlen v. United States, 2 Ct.Cust.Appls. 206, T.D. 31947; Coro, Inc. v. United States, 41 CCPA 215, C.A.D. 554. In United States v. Geo. S. Bush & Co., 26 CCPA 145, C.A.D. 8, this test was applied in the context of the provision in paragraph 318, "suitable for use in paper-making machines." The test does not imply that the specified use be the chief use. But a mere casual, incidental, or possible use will not meet the test. United States v. Lorsch & Co., 8 Ct.Cust.Appls. 109, T.D. 37222; Close & Stewart v. United States, 20 Cust.Ct. 25, C.D. 1078.

Defendant bypasses these tests and makes much of the fact that plaintiff's witnesses did not testify "as to how a paper-making machine operates." (Defendant's brief, page 24.) Whether or not this would have been or is relevant, we need not say, but the fact is they were not asked how a papermaking machine operates, either on direct or cross-examination. What plaintiff's witnesses did testify to, and for that matter defendant's witness also, is relevant and undisputed, that is, that in the general papermaking industry the wire that goes around the cylinder mold is the crimped warp wire, and that the smallest measurement of that wire, in terms of the cylinder diameters standard in the papermaking industry, 36-inch diameter being minimal, is 114 inches, possibly 113 inches. While defendant's witness Stern did testify, on direct examination, that a 108-inch warp would go around the diameter of a 36-inch cylinder, he hedged this statement a good deal on cross-examination, finally admitting that it would take a warp closer to 113 inches. As to Mr. Stern's testimony that his company makes screens "anywhere in a range from say approximately 100 inches up to 150 inches in circumference" (R. 84), this, quite general statement, is not directly tied to papermaking cylinders and is inconsistent with his more definitive statement that papermaking "cylinders are generally filled from a length of say, 3 feet, 36 inches" (R. 93) which, as the record indicates, requires a warp closer to 113 inches.

◼ Legal precedents, cited by plaintiff, additionally support that a 10-inch mesh is not suitable for use in paper-

making machines. Numerically, the higher the mesh, the finer the screen and, in this connection, 28-mesh screen, Geo. S. Bush & Co., Inc. v. United States, 69 Treas.Dec. 251, T.D. 48138 (1936); Geo. S. Bush & Co., Inc., et al. v. United States, 72 Treas.Dec. 441, T.D. 49211 (1937), affirmed on appeal United States v. Geo. S. Bush & Co., Inc., et al., 26 CCPA 145, C.A.D. 8 (1938); Paper Mill Equipment, Ltd. v. United States, 7 Cust. Ct. 25, C.D. 526 (1941); and 25-mesh screens, Geo. M. Graves Co., Inc. v. United States, 6 Cust.Ct. 344, C.D. 493 (1941), were held not suitable for use in papermaking machines under paragraph 318, and properly dutiable under paragraph 372 as parts of machines, not specially provided for. It is this holding, we take it, which is the basis of plaintiff's primary claim under paragraph 372, which we next consider.

The argument on both sides, as to plaintiff's alternative claims under paragraph 372 or paragraph 318, is relatively brief and to the point. Plaintiff, citing the *Bush* cases, supra, suggests that "the case law requires screens which are parts of machines (other than papermaking machines) must be classified as 'parts' of machines in paragraph 372." (Plaintiff's brief, page 24.) Defendant devotes one paragraph to argue a failure of proof that the imported screens are parts, dedicated to any machine, only to wind up and say, if they are parts, the term "screen" in paragraph 318 is more specific than that for parts of machines in paragraph 372.

We find the screens are parts of machines. The testimony of Mr. Daniel Nowlin, Johns-Manville Products Corp., and exhibits 3, 4, and 5 are probative on this phase of the case.

The sum of Mr. Nowlin's testimony which, again, is undisputed, is that the screens were manufactured to the specifications of Johns-Manville Products Corp. for use on cylinder rolls incorporated into a machine designed to make Transite pipe, a conduit for water, sewage, and electrical wiring. Without the screens, the machine could not produce pipe which is made from a slurry of materials fed into a vat. The cylinder mold, with the screen around it, rotates in the vat to pick up the slurry and form a sheet. The cylinder mold then transfers the sheet to a "felt" which passes over vacuum boxes for dewatering purposes. With this done, the sheet is transferred onto the next process. The screen is the facing, so to speak, on which the sheet is formed. (R. 33.) Transite cylinder molds are 34 inches in diameter, and the imported screens were produced with warps of 108 and 109 to wrap around the specified diameter. The 10-mesh and 50-mesh screens are used in tandem, the 10 inch as backing wire around the cylinder with the 50 inch over it and around the cylinder. In our opinion, these incidents dedicate the screen to use with the Transite machine which is the test of a "part." Trans Atlantic Company v. United States, 48 CCPA 30, C.A.D. 758.

Much could be written about the relative specificity of competing tariff provisions, to which defendant averts without discussing the principles. We do not discuss them (for discussion see, United States v. Lansen-Naeve Corp., 44 CCPA 31, C.A.D. 632), since there are adjudicated cases dealing with screen which we feel control our decision here. Starting with H. N. Hill v. United States, 49 Treas.Dec. 895, T.D. 41596, under the 1922 act, followed in turn by the *Bush* (one of which was affirmed on appeal), Graves, and Paper Mill Equipment cases, supra, it has been held that screen dedicated to use in machines, but not suitable for use in papermaking machines, is dutiable under paragraph 372, as parts of machines, not specially provided for. Defendant did not try to distinguish this line of cases and we cannot.

The protest claim under paragraph 372 is sustained. The claims under paragraphs 318 and 353 are overruled.

Judgment will be entered accordingly.