DURBROW & HEARNE ET AL. *v.* UNITED STATES (No. 2194).[1]

1. EMBROIDERY AND SEWING MACHINES.

The fact that a sewing machine may be used for embroidering does not keep it from being a sewing machine and make it an embroidery machine within the meaning of those expressions occurring, respectively, in paragraphs 441 and 165, tariff act of 1913. The test is the primary purpose of its construction and design.— Durbrow & Hearne Manufacturing Co. *v.* United States (9 Ct. Cust. Appls. 148; T. D. 37993).

2. SEWING MACHINES ADAPTED FOR EMBROIDERING.

Sewing machines which are constructed so that they feed more slowly than ordinary sewing machines and, by an attachment, in any desired direction instead of in a straight line, the purpose of such construction being to make them capable of being used for embroidering, remain sewing machines under paragraph 441, tariff act of 1913, and do not become embroidery machines under paragraph 165.

United States Court of Customs Appeals, January 22, 1923.

APPEAL from Board of United States General Appraisers, G. A. 8544 (T. D. 39169).

[Reversed.]

*B. A. Levett* for appellants.

*William W. Hoppin,* Assistant Attorney General (*Samuel M. Richardson,* special attorney, of counsel), for the United States.

[Oral argument November 22, 1922, by Mr. Levett and Mr. Richardson.]

Before SMITH, BARBER, and MARTIN, Associate Judges.

BARBER, Judge, delivered the opinion of the court:

The only question in this case is whether the three machines under consideration identified as Nos. 1, 11, and 23 should be classified as sewing machines under paragraph 441 or as embroidery machines under paragraph 165 of the tariff act of 1913.

Mr. Hearne, a witness connected with the importing firm who had been in the business of buying and importing machines some 25 or 30 years, and had qualified as an expert in patent cases involving sewing machines, testified as to the primary design and purpose of Exhibit 1 which is typical.

---

[1] T. D. 39440.

As I stated before, first to produce a chain stitch with a single thread of the Wilcox & Gibbs type, and second, it has a feed arrangement so it can feed in any direction. An ordinary plain sewing machine, as it might be called, will feed only in a straight line, and if they want to turn a corner, they have to turn the goods. This machine has a device on it, where by turning a crank you can turn the work around without turning the goods. For instance, you can make a square or a circle on it. Q. What do you call that feed? A. Universal feed.

So far as a description of the No. 1 machine is concerned, the correctness of the foregoing testimony is not challenged. Machine No. 11 differs from No. 1 in that it has an attachment for sewing on braid and No. 23 by the fact that it has an attachment for producing an embroidery stitch called cording. As imported some of these machines have attachments on them and some do not. The attachments can all be taken off or put on and used or not, according to the desire of the operator, and with no attachment on the machines sew in a straight line. Some machines having the universal feed have always been given free entry.

It appeared that the manufacturer of these machines advertised them as embroidery machines, but the importer had nothing to do with that, however.

Mr. Slater, an officer of the Singer Sewing Machine Co., a competitor of the importers, testified on behalf of the Government that in most material respects a machine produced by his company No. 114–W–103 was similar to the importers' machine No. 1 and that his machine was primarily constructed, designed, and exclusively employed as an embroidery machine.

Mr. Ahlstrom, an importer, was also called as a witness by the Government. He testified that while importers' machine No. 1 can do plain sewing, it would be disadvantageous to so employ it, because of its slow speed, as it produced only 1,200 to 1,500 stitches per minute to 2,000 to 3,000 made on an ordinary sewing machine. He also testified that the fact that the importers' machine caused the chain stitches, so called, to appear on the under side instead of on the upper side, which is one thing upon which the Government relies to establish that the imported machines are embroidery machines, did not, in his opinion, make any difference and that he knew of sewing machines which had such stitch on either side.

It also appeared that the machine which Mr. Slater said was an embroidery machine was referred to as a sewing machine in a pamphlet issued by the Singer Sewing Machine Co. containing directions or instructions for the use of their sewing machines, although the instructions called attention to the fact that such machines would produce embroidery when manipulated as directed.

There was an attempt made to show a commercial designation as to embroidery machines on the part of the Government, but the Board of General Appraisers refused to sustain the claim, because

sewing machines are referred to commercially either by the name of the inventor or particular manufacturer or in some other way, and in that respect we agree with the board.

It is unnecessary to go into any analysis of the testimony, which related very largely to the kind of work produced by various machines, some called sewing machines and some called embroidery machines, but it is apparent that the moving fact as a basis upon which the board overruled the protest was the use of the universal feed attachment on the imported machines and, in connection therewith, the fact that the machines in question feed less rapidly than the ordinary sewing machine now does.

In Durbrow & Hearne Manufacturing Co. v. United States (9 Ct. Cust. Appls. 148; T. D. 37993), we considered a question very similar to the one here involved.

The Board of General Appraisers had carefully examined the issue, and we adopted to a large extent their reasons supporting the proper method of determining when a machine was a sewing machine and when an embroidery machine.

The difficulty in cases of this kind arises from the fact that most, if not all, sewing machines with some of the attachments now commonly made to be used thereon will produce, when properly manipulated, what is regarded as embroidery and are used for that purpose, and probably some sewing machines, with the appropriate attachments therefor, are used more for embroidering purposes than anything else, and the importers in this case concede that these machines are used for ornamental as well as plain work.

In the Durbrow & Hearne case, supra, we held that a machine which was "primarily constructed and designed for sewing fabrics is still a sewing machine, although used for the purpose of embroidery work, and, on the other hand, a machine primarily constructed and designed to do embroidering remains such, even assuming, although we do not understand that it is so, it might be used for ordinary machine sewing. The question is not so much what it does as what it is primarily constructed and designed to do."

As bearing somewhat upon the interpretation to be given to paragraph 165, it is to be noted that Congress refers to embroidering machines in connection with lace-making machines, which may be regarded more in the nature of machines for producing articles of luxury as distinguished from sewing machines, which are articles of common every-day use by multitudes of people, and that parts of embroidery machines are not referred to in paragraph 165, while paragraph 441 not only gives free entry to sewing machines but parts thereof including repair parts.

We do not think the question of chief use is a safe criterion for determining within which class a particular machine may fall, but

that it is more likely to carry out the intent of Congress to reaffirm the doctrine of Durbrow & Hearne Co. case, supra, that the primary construction and design of the machine (in the absence of a commercial designation) must control.

We think the evidence here clearly establishes that the primary construction and design of these machines are for sewing and not for embroidering. The fact that the universal feed, which is an attachment to the machine, enables it to sew in any direction without moving the fabric by the hand of the operator is not such a departure from the general design of a sewing machine to place it as a matter of law in the class of embroidery machines, nor does the difference in speed necessarily lead to that conclusion.

The Government does not contend that this machine was designed, constructed, or adapted for embroidery only, and there is no question that there are such machines.

We think the board erred in holding these machines were primarily constructed to do embroidery work, and its judgment is therefore *reversed.*