UNITED STATES *v.* GEO. S. BUSH & CO., INC., ET AL. (No. 4150)[1]

United States Court of Customs and Patent Appeals, May 31, 1938

*Charles D. Lawrence,* Acting Assistant Attorney General (*Joseph E. Weil,* special attorney, of counsel), for the United States.

*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for appellees.

[Oral argument April 13, 1938, by Mr. Weil and Mr. Tuttle]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LENROOT, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:[2]

This is an appeal by the Government from a judgment of the United States Customs Court, Second Division, sustaining protests of different importers against the classifications and duty assessments by the Collector of Customs at the port of Seattle, Wash., of merchandise described as "28 mesh Fourdrinier wire," or "28-inch mesh Fourdrinier wire screens." Six protests are involved, the cases having been consolidated for trial.

The collector's classifications were under the last provision of paragraph 318 of the Tariff Act of 1930, reading:

Fourdrinier wires and cylinder wires, suitable for use in paper-making machines (whether or not parts of or fitted or attached to such machines), and woven-wire cloth suitable for use in the manufacture of Fourdrinier wires or cylinder wires, 50 per centum ad valorem.

[1] C. A. D. 8.

[2] JACKSON, Judge, took no part in the consideration or decision of this case.

Duty was assessed in all cases, however, at the rate of 75 per centum ad valorem by reason of a Presidential proclamation, T. D. 44755, 59 Treas. Dec. 702, issued March 31, 1931, prior to any of the importations here involved, under the flexible tariff provision, section 336 of the Tariff Act of 1930, plus, in at least some of the cases, an additional 3 cents per pound under section 601 (c) (7) of the Revenue Act of 1932, the latter tax having been provided for "articles * * * in which copper (including copper in alloys) is the component material of chief value." This latter tax is not in issue here, since it applies, no matter what classification the merchandise may be given.

Each protest presents alternative claims, but the only one pressed before us is that sustained by the trial court under paragraph 372 of the 1930 act, the pertinent portion of which reads:

PAR. 372. * * * all other machines, finished or unfinished, not specially provided for, 27½ per centum ad valorem: *Provided*, That parts, not specially provided for, wholly or in chief value of metal or porcelain, of any of the foregoing, shall be dutiable at the same rate of duty as the articles of which they are parts * * *.

During the taking of the testimony in this case, it was shown that the merchandise involved was identical with merchandise involved in the case of *Geo. S. Bush & Co., Inc.* v. *United States*, decided by the Customs Court, Second Division, January 29, 1936 (not appealed), the decision being reported as T. D. 48138, 69 Treas. Dec. 251, and, upon motion of appellee without objection by the Government, the record in that case was made a part of the record here. In that case the importer called two witnesses; the Government none. In the instant case the importers presented the testimony of one witness, a customs examiner, merely to show the similarity between the merchandise at bar and that in the former case. The Government called one witness.

In the opening paragraph of the brief on behalf of appellees there is the following general statement:

This appeal relates to merchandise which, altho it is known as Fourdrinier wire, is actually a wire web or screen seamed together at the ends * * *, 65 feet long and 154 inches wide * * *, and having a mesh of 28 wires to the inch * * *. Such screens are parts of Fourdrinier machines used in the manufacture of pulp * * *, that being their exclusive use * * *. They are neither used nor suitable for use in the manufacture of paper * * *.

The stars above used are in place of citations to pages of the record. No part of the text is omitted.

The Government contends, in substance, that the merchandise is Fourdrinier wire and is used on a Fourdrinier machine, which is chiefly used for paper making; that the machine is used with a 28-inch mesh screen to make paper board; that such board is paper and that

such wire is suitable for use in paper making machines. Further, the Government says:

4. The law does not provide that the screen must be used for the making of paper. It merely provides that it must be suitable for use in paper-making machines.

5. Any machine essential and chiefly used in any process to make paper from paper pulp is a paper-making machine. The screen in the case at bar is used on such a machine.

The decision of the trial court in the former *Bush & Co.* case, *supra*, was much more elaborate than its decision in the instant case and we have resorted to it to find much of the reasoning underlying both decisions. After a review of the testimony with quotations therefrom, in that case, which, as has been stated, is a part of the record here, the court made the following specific findings:

1. That the imported merchandise, a sample of which is in evidence as Illustrative Exhibit B, consists of Fourdrinier wire known as "28 mesh" in the form of screens having 28 openings to the lineal inch.

2. That said screens are in the nature of endless belts which are used in making pulp.

3. That the sole function of said screens is to eliminate or remove the water from, or in other words to dehydrate, the raw material in making pulp.

4. That Fourdrinier wire screens having a mesh less than 55 openings to the lineal inch are incapable of use in paper making, the coarseness of the mesh resulting in loss of raw material which would inevitably escape with the water through said openings.

5. That in paper making the Fourdrinier wire screens (a sample thereof being in evidence as Illustrative Exhibit C) have a fine mesh of from 70 to 90 openings to the lineal inch; and the screens are kept moving at a speed from 10 to 12 times that at which the screens move in machines making pulp.

6. That the imported Fourdrinier screens having a 28 mesh are unsuitable for use in paper-making machines.

In the instant case the court did not again review the testimony for the importers, except to state the purport of that of the customs examiner, but did review and quote from the pertinent testimony of the Government's witness, and held that it furnished no reason for departing from its former decision.

We have independently examined all the testimony, and quite agree with the trial court in its findings of fact. Its finding No. 6 in the prior case seems to have involved, to an extent, a question of law, viz, the tariff meaning of the phrase "unsuitable for use in paper-making machines."

It is perfectly clear from all the pertinent testimony that wire such as that at issue is not actually used, nor can it be used, in making paper as the term "paper" is commonly understood, because the meshes are too large. The witness for the importers and the witness for the Government agree fully as to that.

It seems, however, that 28-mesh wire—that is wire in the form of screens having 28 openings to the lineal inch—is used on machines for making pulp, which machines, by the use of other wire having many more openings to the lineal inch, may also be used for making paper. In other words, it appears that the machines are capable of a double use—one for making pulp and one for making paper, the product depending upon the mesh of the wire used. So, while the wire at issue is used in a machine on which paper is made, the wire itself is not used, nor is it suitable for use, in making paper, unless the pulp product which is made by its use may properly be regarded as paper.

It is a contention of the Government that there is testimony indicating that the *chief use* of the *machine* is for paper making, and hence it is argued that the 28-mesh wire, although not used for making paper as a direct product (disregarding for the moment the contention that the pulp product is paper—a matter later to be discussed) is nevertheless suitable for use in a paper making machine. To state it differently, it seems to be the position of counsel for the Government that any Fourdrinier or cylinder wire suitable to be put on the machine, no matter what the actual use of the wire, should be held to be "suitable for use in a paper making machine."

It may be remarked in the first place that the testimony as to the chief use of the machine being for paper making is quite meager. It was elicited from the Government's witness by a single leading question of Government counsel, and an analysis of the whole of his testimony indicates that the witness confined himself almost entirely to his own experience and practice in his own plant or business. However, even were it clearly established that the chief use of the machine is for making paper, we should still be unable to agree to the construction of the phrase "suitable for use in paper-making machines" for which the Government contends. The phrase "suitable for use," of course, refers to the wires named in the paragraph, and it is our view that the reasonable and common sense meaning is that the wires are not suitable for use in a paper-making machine unless they are themselves suitable for use in making paper.

This court construed the phrase "suitable for use," appearing in paragraph 356 of the tariff act of 1913, in the case of *United States* v. *Lorsch & Co.*, 8 Ct. Cust. Appls. 109, T. D. 37222, it being there held that the phrase "does not in the tariff sense imply or require chief use." We said, *inter alia:*

The adoption of "use" as the test of the application of paragraph 356, in the quoted particular, is not unqualified, but is limited or qualified to *susceptibility for* the use therein expressed. This, and all previous tariff acts, abound with instances wherein "use" is made the criterion of applicability in different degrees or subject to different qualifications or limitations. Such terms as "chief use,"

"suitable for use," "expressly for use," "such as is used," "for use as," "solely for use as," "fit only for," and other similar expressions are familiar terms in tariff adjudication. Each is given its own peculiar sphere of influence in tariff classification. Presumptively this difference of words imports a different meaning, and so the adjucations are.

The term immediately before us was before this court and interpreted in Kahlen v. United States (2 Ct. Cust. Appls. 206; T. D. 31947), wherein we said: "In the tariff law the term *'suitable' means actually, practically, and commercially fit."* See also Mamluck & Co., et al. v. United States (6 Ct. Cust. Appls. 556, 561; T. D. 36198). The rule to the same effect was announced by the Supreme Court. In the case of Chew Hing Lung v. Wise (176 U. S. 156), the United States Supreme Court, in considering the question whether or not tapioca was "fit for use as starch" within that language as used in paragraph 323 of the act of 1890, said:

We think the language of the paragraph means any preparation which is so far fit for use as starch as to be *commonly used* or *known* as such *or as a substitute therefor.* * * * and * * * the article here in controversy does not and cannot compete with American starch for any of the purposes for which starch is *commonly and ordinarily* used in this country.

"Actually," or "practically," or "commercially," or "commonly," fit for or used as, in no sense imply or require chief use. Though, of course, as said by this court in French Import Co., et al., v. United States (7 Ct. Cust. Appls. 460; T. D. 37048), chief use necessarily implies a common and, therefore, a suitability of use.

A distinction between the *Lorsch* case, *supra* (and cases therein quoted from), and the case at bar, as the Government would have the phrase construed here, is that in the former cases the "suitable for use" phrase applied directly to the merchandise at issue, whereas here the Government seemingly would make the test depend not so much upon the merchandise itself but rather upon the use of the machine in which the merchandise is utilized. It seems to us that the phrase should be limited to the merchandise and construed to mean for use on a paper making machine in making paper. The use of wire such as that here involved is shown to be confined to making pulp (that is, it is used in dehydrating or drying the wet mass of ground material), coarse fiber board and building board. The question here is not the same as that involved in the case of *Durbrow & Hearne et al.* v. *United States*, 11 Ct. Cust. Appls. 446, T. D. 39440, cited by the Government. Involved there was the classification of *machines* (that is whether they were sewing machines or embroidery machines)—not the classification of attachments. Here is involved the classification of an attachment.

This brings us to the consideration of other of the Government's contentions.

It is argued that the wire here at issue is used simply in dehydrating the pulp and, in substance, that the making of pulp is a step in the making of paper, wherefore the wire may properly be said to be suitable for use in a paper making machine.

One difficulty with this position, as we view it, is that pulp has many other uses besides that of being made into paper, and the Tariff Act of 1930 recognizes pulp as a tariff entity by providing, as for example

in paragraph 1403, for different compositions of pulp, or pulp stock and manufactures of pulp. It was stated in cross-examination by one of the witnesses called by importers that "There are about a dozen or more different purposes for that [pulp stock]."

Another contention of Government counsel is that pulp board made with a 28-mesh wire on a Fourdrinier machine *is paper*. One of the witnesses for importer in the *Bush & Co.* case, *supra*, stated that the wire could be used in making coarse fiber board (similar to the sample introduced as illustrative of "pulp stock") and building board. These the Government contends are heavy papers, and cites the case of *United States* v. *Overton & Co.*, 6 Ct. Cust. Appls. 248, T. D. 35474, where, in a case arising under the 1913 tariff act, this court held certain merchandise described in the opinion as "placards, show cards, or advertising signs composed of cardboard and surface-coated paper" classifiable under paragraph 420 of that act as manufactures of paper.

The distinctions between that case and the case at bar are:

First, the merchandise there involved was not the same as that which is here shown to be made with the use of 28-mesh wire. Second, the 1913 tariff act contained no *eo nomine* provision for the merchandise there involved while the Tariff Act of 1930, paragraph 1402, provides for paper board and wallboard, and, as already indicated, paragraph 1403 provides for "Filter masse or filter stock, composed wholly or in part of wood pulp." It is also noted that paragraph 356 of the latter act seemingly distinguishes between pulp and paper machinery to the extent, at least, that both are named therein.

The sample placed in evidence, as illustrative of a product made by the use of 28-mesh wire, consists of a thick, soft, rough article stated by one of the witnesses to be pulp stock having numerous uses. The uncontradicted testimony is to the effect that in order to make paper from this, it is necessary to shred and beat it up again, add chemicals, coloring (if desired), filling clay, and run it over a wire screen of 60 to 65 mesh. Uncontradicted testimony also shows that paper is not always made from pulp stock but frequently is made directly from wood in a single continuous process on a Fourdrinier machine with the use of wire screen, ranging in mesh from 60 to 80— that is, having 60 to 80 openings to the lineal inch.

Reference is made in the brief on behalf of the Government to the Report of the Tariff Commission (report No. 14, second series) which resulted in the Presidential proclamation increasing the duty on—

cylinder wires having more than 55 meshes per lineal inch in warp or filling, and Fourdrinier wires, suitable for use in paper-making machines * * * and on woven-wire cloth having more than 55 meshes per lineal inch in warp or filling and suitable for use in the manufacture of Fourdrinier wires or cylinder wires * * *.

The argument with respect to this is that the report "discloses no limitation, restriction or qualification on the mesh per lineal inch of Fourdrinier wires."

While the proclamation indicates that this is true, it does not seem to us to be of aid in construing the statute. The statutory language is used in the proclamation and obviously requires the same construction as the statute.

Upon the record presented, we conclude that the decision of the trial court was without error and its judgment is *affirmed*.