(C.D. 2647)

F. B. VANDEGRIFT & Co., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 6, 1966)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Charles P. Deem*, trial attorney), for the defendant.

Before RAO and FORD, Judges

FORD, Judge: Upon importation into the United States, merchandise referred to as key blanks or key castings, covered by the protests enumerated in the schedule attached to and made part of this decision, was classified by the collector of customs as articles not specially provided for, composed wholly or in chief value of iron, within the purview of paragraph 397 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and

subjected to duty at the rate of 20 per centum or 19 per centum ad valorem, depending upon the date of entry.

Certain of the key blanks or key castings are claimed, in the alternative, to be properly classifiable within the provisions of paragraph 327 of said act either as malleable iron castings, not specially provided for, of the kind specified in the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and dutiable at 10 per centum ad valorem, or as castings of iron which have been advanced in condition subsequent to the casting process, as provided in the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and subjected to duty at the rate of 5 per centum ad valorem.

We set forth below the pertinent language of the statutory provisions referred to.

Paragraph 397 of the Tariff Act of 1930, as modified by the sixth protocol, *supra:*

Articles or wares not specially provided for, whether partly or wholly manufactured:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

 Composed wholly or in chief value of iron, steel, cooper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

 Not wholly or in chief value of tin or tin plate:
  Carriages, drays, * * *.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

  Other, composed wholly or in chief
   value of iron, * * *_____ 20% ad val.
             19% ad val.

Paragraph 327 of said act, as modified by the General Agreement on Tariffs and Trade, *supra*:

Castings of malleable iron not specially provided for:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

 Other _____ 10% ad val.

Paragraph 327 of said act, as modified by the Torquay protocol, *supra*:

Cast-iron andirons, * * * and castings and vessels wholly of cast iron, including all castings of iron or cast-iron plates, which have been chiseled, drilled, machined, or otherwise advanced in condition by processes or operations subsequent to the casting process but not made up into articles, or parts thereof, or finished machine parts_____ 5% ad val.

The only witness called to testify in this case was William Taylor who appeared on behalf of plaintiff. Taylor testified that for 31 years

he has been a principal, an officer and a managing stockholder of the Taylor Lock Co. (the actual consignee of the importations), which company manufactures locks and builders' hardware. The witness stated that he grew up in the family business and upon graduation from the University of Pennsylvania, with a degree of bachelor of science in economics, became a full-time employee. He described the Taylor Lock Co. as having "a completely integrated manufacturing procedure" and that the company sells its products throughout the United States and throughout the world. Taylor stated that he has been active in all phases of the business and in various associations connected with the industry.

The witness stated he is familiar with each of the items on the invoices covered by the three protests before the court, his familiarity flowing from the fact that he purchased said items and had them processed in this company's plant.

At this point in the proceedings, seven exhibits were received in evidence, which we identify below in tabular form:

| Exhibit No. | Merchandise item No. | Covered by protest | Remarks |
|---|---|---|---|
| 1 | 502 | 62/9725 | In the condition as imported. |
| Illustrative 2 | 50117 | 62/9725 | Not in the condition as imported, but as it appears after processing in the United States by grinding, cutting, fine tumbling, and nickel plating. |
| 3 | 501, not N.P. [not nickel plated] | 62/9761 (entry 20588) | In the condition as imported. |
| 4 | 0502, not N.P. | 62/9761 (entry 20588) | In the condition as imported. |
| 5 | 504, unplated | 62/9761 (entry 15609) | In the condition as imported. |
| Illustrative 6 | 30013 | 62/9726 | Not in the condition as imported, but as it appears after being processed in the United States by grinding, fine tumbling, and nickel plating, and possibly by straightening. |
| 7 | 503 | 62/9726 | In the condition as imported. |

(The parties hereto agreed that the merchandise on entry 21726 accompanying protest 62/9726 designated as item "50017" should correctly read item "50117," an illustrative sample of which had been received in evidence as exhibit 2.)

It is left to be inferred by the court rather than being clearly set forth by the protesting party that, although the four consumption entries accompanying the three protests in issue cover a considerable number of different merchandise item numbers, the present litigation is limited to items 502, 50117, 501, 0502, 504, 30013, and 503, referred to above, wherever they may appear in the invoices accompanying the entries herein. As so limited, we revert to the testimony of Witness Taylor.

The process of manufacture of the key blanks in issue up to their state at the time of importation has been so clearly expressed by the witness that his testimony on this point is quoted verbatim—

When a key is ordered from a foundry, a pattern is made. * * * The pattern is called a machine plate. And the pattern consists of multiple duplications of the exact article that's ordered on a gate or an area that looks like a spine with many castings running out from it. Each set—a machine plate may hold anywheres from 40 to 60 of these duplicate castings. When this machine plate or pattern is finished it is impressed in certain special kinds of sand and impressions are made in the sand. The pattern or machine plate is removed and the impression remains in the sand. And molten iron is poured into these impressions and when cooled the sand is broken away, the impressions are broken away from the gate and become castings. These castings in the trade are known as white or gray iron castings. And their characteristics are hardness and brittleness. The term "malleable iron casting" is a further step in the production of castings and follows white or gray iron castings. After these castings of white or gray iron are broken from the gate they are packed in containers with some sand or cinders and heated to a temperature of 1,600 degrees and kept in this heat for approximately two or three days, and then cooled for another two or three days. That process is called "malleableizing." At the end of this four or six days period of time the iron casting has become ductile or malleable. And I am not a metallurgist and I cannot explain exactly why it has, but I know from speaking to metallurgists that the reason that it becomes ductile and malleable is the change in the carbon content of the molecules of the casting. And this malleable iron casting is the only kind of casting that can be used by any lock company, not only ours but anybody and anyplace in the world.

*   *   *   *   *   *   *

The casting, as it becomes a malleable iron casting, and that's the finished casting, there may be one further operation on it. When taken from the annealing or oven-treating process often has a scale which consists of both a burr from the gate and perhaps particles of sand sticking to it. And it's put through a rough-tumbling or barrel operation and that takes off some of the roughness and sand. And then it's shipped.

The "rough-tumbling or barrel operation" referred to was subsequently explained as a procedure whereby castings are placed in a large wooden barrel together with some grit or cutting agent. The

barrel is revolved at a fairly slow speed of 20 or 30 revolutions per minute for the period of time required to do the minimum amount of deburring, snagging, or cleaning that a customer will accept. The witness stated his company's standards in this regard were pretty high since it wished to get the best product possible.

The articles in issue are not sold in the condition just described but must be subjected to processes of machining and finishing in this country. Machining would be the first operation and would consist of reducing the key castings to their proper size and putting cuts or grooves in them to operate a lock. Straightening would be done on those keys that have become bent in the process of annealing or during subsequent sizing operations. Then the articles are tumbled in steel balls, ball bearings, or other polishing agents, together with water and soap, to render them smooth and highly polished. As a final operation they are nickel plated to prevent oxidizing or rusting. And when finally finished, the keys are ready to fit the particular locks for which they are made.

Defendant seeks to negate the claim of plaintiff for classification of the key blanks in issue as malleable iron castings in paragraph 327 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*, and particularly so as to item 0502 which is represented by exhibit 4. In its brief, defendant points out that said item No. 0502 is described on the commercial invoice accompanying entry 20588 covered by protest 62/9761 as "straightened" and argues that, inasmuch as such an operation is an advancement beyond the casting process, key blanks identified as No. 0502 have been advanced beyond the stage of malleable iron castings and cannot find classification as such in paragraph 327 of the tariff act.

As to the weight to be given the statement contained in the entry papers, we make reference to the case of *Swift & Co.* v. *United States*, 14 Cust. Ct. 171, C.D. 930, wherein this court, in the course of determining that the importation there before it consisted in fact and in law of tallow rather than oleo stearin within the purview of paragraph 701 of the Tariff Act of 1930, took occasion to say—

Although descriptions in entries and other documents are admissions against interest and presumptively correct, the importer is not precluded from disproving the correctness of such descriptions. *United States* v. *Wo Kee & Co.*, 21 C.C.P.A. 341, T.D. 46880; *United States* v. *Alex Schechter Corp.*, 25 C.C.P.A. 107, T.D. 49240; *United States* v. *Rockhill & Vietor et al.*, 10 Ct. Cust. Appls. 112, T.D. 38374; *Lee & Co.* v. *United States*, 15 Ct. Cust. Appls. 202, T.D. 42236.

Granting *arguendo* that the statement in the commercial invoice pinpointed by the defendant in its brief may appear to be an admission against interest, whatever evidentiary value said statement might

bear is negatived in the circumstances of the present case for the reason that there is uncontradicted oral testimony of record presented by plaintiff which sets forth in detail the processes to which the imported articles are subjected prior to importation, of which "straightening" is not one, and the further fact that the "straightening" to which plaintiff's witness did refer, and described as a machining process, took place as one of the finishing processes after importation.

We are of the opinion, therefore, that plantiff has shown, by the testimony of a well-qualified witness, that the key blanks, described as item 0502 and represented by exhibit 4, have been produced in the same manner and subjected to the same processing as the other key blank items in controversy, and that said production and processing did not include a "straightening" procedure.

There remains to be determined the basic issue before the court, to wit, are the imported key blanks properly classifiable for customs duty purposes as malleable iron castings, or have they been so processed after casting and malleableizing as to remove them from that category? What constitutes an advancement of an iron casting has been the subject of judicial determination by this and the appellate court on several occasions. Reference thereto has been made by the parties in their briefs. Briefly stated, the following processing has been held to be advancements beyond the stage of casting—

Galvanizing of malleable iron castings (*Columbia Malleable Castings Corp.* v. *United States*, 31 CCPA 14, C.A.D. 243).

Galvanizing and threading of malleable pipe fittings (*Green Kay Corporation, et al.* v. *United States*, 29 CCPA 216, C.A.D. 193).

Threading of malleable iron pipe couplings or fittings (*Dulien Steel Products, Inc., et al.* v. *United States*, 27 CCPA 285, C.A.D. 102, and *Geo. S. Bush Co.* v. *United States*, 3 Cust. Ct. 27, C.D. 195).

Nickel plating of sewing machine eccentrics (*United States* v. *Durbrow & Hearne Manufacturing Co.*, 5 Ct. Cust. Appls. 410, T.D. 34940).

Annealing and dipping in japan of cast iron car replacers (*F. W. Myers & Co.* v. *United States*, 37 Treas. Dec. 117, T.D. 38154).

Machining and nickel plating of sewing machine presser feet (*C. B. Richard & Co.* v. *United States*, 25 Treas. Dec. 250, T.D. 33787).

It is apparent that iron castings which have been subjected to the processes above referred to of galvanizing, threading, nickel plating, and so forth, constitute castings advanced in manufacture beyond the casting processes. The uncontradicted record before us discloses that the instant castings have not been so subjected.

Plaintiff in support of its claim for classification of the articles in issue as malleable iron castings in paragraph 327 relies heavily on the case of *United States* v. *The Singer Manufacturing Company*, 37

CCPA 104, C.A.D. 427. Involved in said case was the classification of certain articles described as "Rough Unmachined Castings (Cast Iron)" found to be properly dutiable at 10 per centum ad valorem in paragraph 327 of the Tariff Act of 1930, as modified, as claimed by the importer, rather than as "parts of machines, not specially provided for," in paragraph 372, and dutiable at 27½ per centum ad valorem, as assessed by the collector of customs.

In the course of the decision, the following appears—

The undisputed testimony is that the imported merchandise consists of rough, unmachined castings of iron with nothing done to them after the foundry work except the tumbling, grinding, and sandblasting, which simply consists of taking the sand off the castings and removing any burrs or projections; that none of the castings have been machined, drilled, or otherwise advanced in condition or in value before importation; and that none of the castings in their imported condition could be used as a part of a power transmitter or power table which was their intended use in their finished condition; also, that none of the castings could be used in their imported condition for any commercial use as a made-up article or as a part of a made-up article, or as finished machine parts; and that the castings were of such form and shape that their only use was to be made into parts for a power transmitter or power table after essential additional work was done including milling, drilling, facing, tapping, boring, reaming, counter-boring, japanning, grooving, grinding, and assembling.

Further in said decision the court stated—

We doubt if castings of iron are ever made without a predetermined ultimate use which determines the form in which the castings are made. While the castings here involved were cast into form so as to be ultimately used as parts of a power transmitter or power table, they have not been advanced in manufacture after being cast. They were imported in the condition in which they left the foundry, nothing having been done to them after they were cast except the removal of gates, burrs, and other excrescences. * * *

We are aware of distinguishing features between the issue presented in the *Singer* case, *supra*, and that at bar. For instance, in the *Singer* case cast iron castings and not malleable iron castings were involved. Moreover, paragraph 327 of the Tariff Act of 1930, in addition to providing for cast iron castings and malleable iron castings, *per se*, also provides for "all castings of iron * * * which have been chiseled, drilled, machined, or otherwise advanced in condition by processes or operations subsequent to the casting process but not made up into articles, or parts thereof, or finished machine parts"—but said paragraph 327 does not so extend the provision for malleable iron castings. This distinction was recognized in the case of *Green Kay Corporation, supra*. In said *Green Kay* case, the classification by the collector of customs of certain malleable cast iron fittings classified as articles

or wares, not specially provided for, composed wholly or in chief value of iron, in paragraph 397 of the Tariff Act of 1930, which was sustained by the trial court, was affirmed on appeal. In the course of the opinion in that case, the appellate court undertook a detailed study of the casting provision of the current and predecessor tariff acts. Among the conclusions therein reached was the following, which in view of the succinctness of its expression in the syllabus we quote therefrom—

The Congress, when it included the provision "including all castings of iron advanced in condition after the casting operation" after the term *castings of cast iron*, and omitted any such inclusive clause after the provision for *castings of malleable iron*, did not intend that the latter provision should include castings of malleable iron which had been "advanced * * *." Since the involved castings have been further processed after malleableizing [by galvanizing and threading] they do not fall within the provision for "castings of malleable iron." [Italics quoted.]

We are of the opinion, however, that the lack of such language of extension will not prove fatal to the claim of plaintiff herein.

It is to be noted that the statutory provision is for "malleable iron castings" which by its terms would include such malleable iron castings either in a rough state or in a clean state so long as the articles retained their status as "castings." Inasmuch as the testimony of plaintiff's witness Taylor stands uncontradicted that the only operation to which the involved key blanks were subjected after the malleableizing process was a rough tumbling or barrel operation to which the key blanks were subjected for the removal therefrom of burrs and particles of sand, it is apparent to the court that said operation was undertaken to produce a clean, merchantable casting, and did not result in an advancement of the articles beyond the casting process.

We are of the opinion, therefore, that plaintiff's claim for classification of the items of key blanks enumerated above as castings of malleable iron, not specially provided for, in paragraph 327 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, dutiable at the rate of 10 per centum ad valorem, should be sustained.

In the light of the *Green Kay* case, *supra*, the alternative claim of plaintiff for classification of the imported articles as castings of iron advanced in condition subsequent to the casting process in said paragraph 327, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, for which duty at the rate of 5 per centum ad valorem is provided, is untenable and must be overruled.

Judgment will be entered accordingly.