(C.D. 4050)

FEDTRO, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided July 23, 1970)

*Siegel, Mandell & Davidson* (*Joseph S. Kaplan* of counsel) for the plaintiff. *William D. Ruckelshaus,* Assistant Attorney General (*Owen J. Rader* and *Andrew P. Vance,* trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

RE, Judge: The jurisdiction of the court has been duly invoked to determine the proper classification for customs duty purposes of certain merchandise described on the invoices accompanying the entry papers as "portable siphon pumps" and "automatic drain siphon pumps". The merchandise was imported from Japan into the United States through the port of New York. It is covered by five protests which were consolidated for purposes of trial.

The customs officials classified both the portable siphon pumps and the automatic drain pumps within the purview of item 774.60 of the Tariff Schedules of the United States (TSUS) which provides for articles not specially provided for, of rubber or plastics, at the rate of 17 per centum ad valorem.

It is the contention of plaintiff that the articles in issue should properly have been classified as pumps for liquids, of the kind provided for in item 660.90 of TSUS, dutiable at 12 per centum ad valorem. Alternatively, plaintiff claims that the articles are properly classifiable within the provisions of item 772.65 of TSUS for hose, pipe, and tubing, with duty at the rate of 8½ per centum ad valorem.

The following are the pertinent statutory provisions from the Tariff Schedules of the United States:

As classified:

"Articles not specially provided for, of rubber or plastics:

\*     \*     \*     \*     \*     \*     \*

774.60     Other _____     17% ad val."

Claimed classification:

660.90     "Pumps for liquids, whether or not fitted with measuring devices; \* \* \* all the foregoing whether operated by hand or by any kind of power unit, and parts thereof.     12% ad val."

Alternative claimed classification:

772.65     "Hose, pipe, and tubing, all the foregoing not specially provided for, of rubber or plastics, suitable for conducting gases or liquids, with or without attached fittings.     8.5% ad val."

Samples of the portable siphon pumps, and of the automatic drain pumps, were received in evidence as exhibits 1 and 2 respectively.

The parties are in agreement that the articles in issue are in chief value of plastic, and that they are not articles of textile materials, stone, ceramic ware, glass or of other materials provided for in schedule 5, or articles of leather or of fur on the skin, all of which are excluded from part 4 of schedule 6 of TSUS, under which plaintiff's "preferred" claim is made. It is also agreed that exhibit 1, the "portable siphon pump", is capable of use as a siphon.

The only witness at the trial was Mr. Barry Wolf, who testified on behalf of plaintiff. He identified himself as an associate professor of mechanical engineering at New York University. Professor Wolf holds bachelor's, master's, and doctor's degrees in mechanical engineering. In addition to the thesis he wrote for his doctorate on the topic of propagation of stress waves in solid material, he has published a few papers in connection with his subsequent investigations in wave propagation.

Exhibit 1, representative of the portable siphon pumps in controversy, consists of a hollow cylinder, slightly tapered at both ends, measuring approximately $3\frac{1}{4}$ inches in length, and $1\frac{3}{4}$ inches in diameter at mid-section. Affixed to one end of the cylinder is a tapered nozzle, approximately $2\frac{1}{4}$ inches in overall length. At the other end of the hollow cylinder there is a nozzle approximately $\frac{3}{4}$ of an inch in length which terminates in a piece of plastic hose $\frac{1}{4}$ inch in diameter and about $5\frac{1}{2}$ feet in length. There is a small disc valve,

hinged to open in one direction, attached to the nozzles at both ends of the plastic cylinder.

Inasmuch as the cylindrical portion of exhibit 1 had been cut to disclose the disc valves, the court received in evidence as exhibit 1–E a sample of the merchandise in its uncut state, as imported.

From the testimony of Professor Wolf it appears that exhibit 1, representative of the portable siphon pumps, is a variation of the common piston pump. Four drawings prepared by the witness, designated as figures 1, 2, 3 and 4, were received in evidence as exhibits 1–A through 1–D. Figures 1 and 2 depict the operation of a normal piston pump. As the piston is depressed, the fluid in the chamber is compressed, the valve in the lower part of the chamber opens, and the fluid is discharged. As the piston is raised, the pressure in the chamber decreases, the lower valve closes, the valve in the upper part of the chamber opens, permitting fluid to refill the chamber, and the cycle is repeated. The portable siphon pumps in issue function in a similar way (exhibits 1–C and 1–D). In the absence of a piston in the articles at bar, hand pressure on the cylinder walls creates a similar increase or decrease in compression within the cylinder bringing about, with the aid of the lower and upper valves, the emptying and refilling of the cylinder area.

Although Professor Wolf had never used the pump in issue nor seen it used, he demonstrated its use, at the request of the court, in the following manner. He placed the end of the hose in a pitcher of water. With his other hand, he pressed in and out the cylinder or chamber attached to exhibit 1. By this operation, water from the pitcher was transferred to a cup resting on the judges' bench, which was at a higher level. When asked if there was a name given to the action thus performed, Professor Wolf replied: "Pumping." He also stated that the device would be recognized by a mechanical engineer as a "pump; in fact, a piston pump."

Professor Wolf stated on cross-examination that exhibit 1 could be used as a siphon, within the common meaning of the term, but that it "is primarily a pump". He added that a hose by itself is a siphon but you do not have to use it as such. When tubing is utilized as a siphon it must be primed in some way so that gravitational force will start the fluid to flow downward. When exhibit 1 is used as a siphon, the bulb part could be used to prime the siphoning action. The valves would remain open throughout the siphoning process.

Exhibit 2, representing the automatic drain pumps in issue, was denominated by Professor Wolf as an ejector pump within the general category of pistonless pumps and was described as having a T shape. The cross part of the T is approximately 3⅜ inches long and the vertical portion 1¼ inches. The inner rim of one end of the

crosspiece is threaded for connection to a high pressure water source such as a sink faucet. The outer rim of the leg is threaded for the attachment of a hose and the other end of the hose is placed in the water to be removed or drained. The merchandise represented by exhibit 2, as imported, was without a hose.

As the water flows from the high pressure water source past the leg to which the hose has been attached, suction is created in the leg and hose, causing water at the end of the hose to be withdrawn. Illustrative of the functioning of an automatic drain pump, there was received in evidence as exhibit 2–A a portion of a card upon which such articles are mounted for purposes of sale.

On being shown a book entitled *Mechanical Engineers' Handbook* (Fifth Edition) by Lionel S. Mark, Professor Wolf testified that it was considered to be the bible of mechanical engineering. On page 1832 the witness identified a diagram of a device labeled "multistage ejector" and stated it was similar to exhibit 2. The ejector referred to appears under a subchapter heading for "Pistonless Pumps". Pages 1829 through 1832 of the Handbook were received in evidence as exhibit 2–B.

The court will first consider the classification of the automatic drain pumps represented by plaintiff's exhibit 2. During the pendency of this case, the court, in an opinion by Judge Newman, decided a case involving a similar article. Although in that case, *Hancock Gross, Inc.* v. *United States*, 64 Cust. Ct. 97, C.D. 3965, decided February 12, 1970, the controversy was between item 654.20 which provides for articles of base metal, not specially provided for, of a type used for household, table, or kitchen use, and item 660.94 (successor item to 660.90 which is presently before the court) covering pumps for liquids, whether operated by hand or by any kind of power unit, the construction given to the provision for pumps in that case has a controlling effect on the question here presented.

As was pointed out in the *Hancock Gross, Inc.* case, and as indicated in the briefs of the parties herein, "pumps" as such were not *eo nomine* specified for import duty purposes until the advent of the Tariff Schedules of the United States. The court, in the *Hancock Gross, Inc.* case, considered in depth the background of the provision for pumps in the tariff schedules.

Defendant seeks to negate classification of the articles represented by exhibit 2 within the provision for pumps for liquids, operated by any kind of power unit, provided for in item 660.90 of the TSUS on the grounds that they cannot function by themselves as pumps, and that their means of functioning does not constitute them pumps operated by a power unit since, defendant contends, water is not a power unit. Defendant contends that the article is "less than a pump" since

"it cannot function by itself as a pump of liquids", and that it is "simply an article of plumbing equipment designed to attach to a source of water." (Defendant's brief, p. 16). Defendant argues further that exhibit 2 is not a pump because it is not a machine, and asserts that "[f]or tariff purposes, a machine must have moving parts", and that the "automatic drain siphon pump" in issue has no moving parts.

Although the article denominated "Drain or Fill" in the *Hancock Gross, Inc.* case was somewhat larger in size and more substantially constructed, the general design, purpose, and means of functioning appear to be identical to the automatic drain pumps (exhibit 2) presently at bar. In the *Hancock Gross, Inc.* case, the court described the merchandise therein as follows:

"The 'Drain or Fill' measures approximately 5¼ inches in length and consists basically of a converging nozzle. At the top of the nozzle, there is an inlet for water and a female-threaded connector which is designed to screw onto a male-threaded water faucet. Protruding from one side of the nozzle, immediately below the female-threaded connector, there is a hollow cylindrical appendage approximately 1½ inches in length which serves as an inlet or outlet for liquid through a rubber hose.[2] At the bottom of the nozzle there is an opening for the discharge of water coming from the faucet and the rubber hose. Also near the bottom of the nozzle there is a bell-shaped attachment containing a rubber stopper. By raising the bell-shaped attachment, the rubber stopper closes the bottom opening, so that water coming from the faucet will be diverted to the outlet at the appendage and will discharge through an attached rubber hose.

"The 'Drain or Fill' may be used to pump water in the following manner: A rubber hose is attached to the appendage, and the female-threaded connector is screwed onto a water faucet. The end of the attached hose is placed in the area or receptacle from which water is to be pumped (drained). When the water faucet is turned on, the jet of water will pass the opening where the appendage on exhibit 1 is located, resulting in a suction. The fluid in the area to be drained is drawn into the hose by suction and is discharged at the bottom opening. If the water faucet is turned off, no suction is produced, and the 'Drain or Fill' cannot pump water.

"When a receptacle is to be filled while the 'Drain or Fill' is on the faucet, the bell-shaped attachment is raised so that the rubber stopper closes the bottom outlet. Water from the faucet will then be diverted from coming out the bottom of the 'Drain or Fill' and instead will run out through the rubber hose. Thus, the bell-shaped attachment permits the 'Drain or Fill' to remain on the faucet while filling a receptacle with the use of the hose. Under

---

[2] The "Drain or Fill" was imported without a rubber hose attached to the appendage. [Footnote in *Hancock Gross, Inc., supra.*]

such circumstances, the 'Drain or Fill' becomes an extension of the hose, so that the hose need not be connected directly to the faucet before the user can alternate from pumping water out of one object to filling another object."

The "Drain or Fill" devices in the *Hancock Gross, Inc.* case, like the automatic drain pumps in the case at bar, were unaccompanied at the time of importation by lengths of hose, but that fact did not bar their classification as pumps within the claimed provision. It is noted also that the illustration of the ejector pump in the *Mechanical Engineers' Handbook* (exhibit 2–B) designates a device similar to exhibit 2 in issue, without any hose attachment, as a pump. Furthermore, the testimony of plaintiff's witness, Professor Wolf, stands uncontroverted that exhibit 2, in its condition as imported, is "an ejector pump" within the general category of pistonless pumps. Even granting arguendo that a hose is essential to the tariff classification of a device smiliar to exhibit 2 as a pump, exhibit 2 would nonetheless be covered by the claimed tariff schedule item inasmuch as "parts" of pumps are likewise provided for at the same rate of duty.

In the present case, defendant also contends that the automatic drain pumps may not be classified within the claimed provision for the reason that the pumps powered by water did not bring them within the requirement of item 660.90 that they be operated by a power unit. It is to be noted that the identical point was raised in the *Hancock Gross, Inc.* case. The court there stated:

"As correctly pointed out by defendant, it is not enough to support classification under item 660.94 that merchandise be 'pumps for liquids', since the provision is qualified by the phrase 'whether operated by hand or by any kind of power unit.' Defendant strenuously argues that the merchandise fails to meet such qualification, and buttresses its position with the following definitions in *Webster's Third New International Dictionary* (1961), pages 1779 and 2500:

*power unit* n: an engine usu. of the internal-combustion type mounted with accessories for use in portable operation of mechanical equipment—compare POWER PACK 2

*power pack* n 1: a unit consisting typically of transformer, rectifier, and filter for obtaining a moderate steady direct current from an alternating-current service * * *

*unit* n * * * 2a: a single thing or person or group that is a constituent and isolable member of some more inclusive whole * * * d: a piece or complex apparatus serving to perform one particular function * * *

"Based upon the foregoing definitions, defendant insists that a 'power unit' refers to an engine. While such interpretation is

supported by Webster's definition of 'power unit,' *supra*, we think that when Congress included the entire phrase 'whether operated by hand or by *any kind* [7] of power unit,' it manifested an intent that item 660.94 be given a broader application than that suggested by the dictionary definition of 'power unit.' The construction urged by the Government would exclude from classification under item 660.94 many types of pumps which are operated by air, gas or fluids. See *Encyclopaedia Britannica* (1970), Volume 18, page 865. In our view, such narrow interpretation was not intended by Congress. We hold, therefore, that since the 'Drain or Fill' is activated by the flow of water from a faucet, the articles are operated by a 'power unit' within the purview of item 660.94."

The court adheres to the position taken in the *Hancock Gross, Inc.* case that a pump activated by the flow of water from a faucet is a pump operated by a power unit within the language of item 660.90 of TSUS.

Defendant's additional argument that exhibit 2 may not be classified as a pump, as claimed, for the reason that it is not a machine, since it has no moving parts, is likewise untenable. After reviewing a similar contention made in the *Hancock Gross, Inc.* case, the court therein stated that "while some pumps contain pistons, valves, or other moving parts, it does not appear that they are an essential attribute of all types of pumps." In reaching its conclusion in that case, the court noted as follows:

"* * *, plaintiff has called to the court's attention the following description of a 'jet pump' in the *Encyclopaedia Britannica*, 1963 edition, Volume 18, page 776B:

Jet Pumps.—In the reciprocating, rotary and centrifugal pumps, there is a moving mechanical part which does work on the moving fluid. However, there is a dynamic type of pump which does not have any moving mechanical parts: it is called variously a jet pump, injector or ejector. In this type of pump the pressure of a fluid is increased as it flows through an arrangement of fixed channels. A 'motive fluid' is used to pump, or induce the flow of, some other fluid.

Jet pumps are found in many applications, pumping many different fluids. A common type is one in which water is the motive fluid and water is the fluid being pumped * * *."

As stated previously, Professor Wolf, in the case at bar, identified the automatic drain pumps in controversy as similar to the multistage ejector illustrated at page 1832 of the *Mechanical Engineer's Handbook* (exhibit 2–B).

Upon the record presented, and predicated on the foregoing considerations, the court holds that the automatic drain pumps in controversy, represented by exhibit 2, are pumps for liquids, operated by a

---

[7] Emphasis added. [Footnote in *Hancock Gross, Inc., supra.*]

power unit, within the purview of item 660.90 of TSUS, with a rate of duty of 12 per centum ad valorem.

As to the portable siphon pumps in issue (exhibit 1), defendant seeks to negate plaintiff's preferred claim for classification of the articles within the purview of item 660.90, on the grounds that "Exhibit 1 was designed and manufactured with special features intended to permit it to serve a purpose separate and distinct from and in excess of those found within the common meaning of the term 'pump'." (Defendant's brief, p. 5)

Plaintiff asserts that exhibit 1 is a "household pump" and that "[i]ts utility as a household item, as contrasted with industrial pumps, is enhanced because it has a self contained hose. Such a hose does not make a pump something else, and does not remove the article from the common understanding of the term pump." (Plaintiff's brief, p. 10)

In support of its contention that exhibit 1 is "more than a pump", the defendant calls attention to the testimony of plaintiff's witness and asserts that "the bulb portion of the article in and of itself is a 'pump' ", and that it is "a complete pump, without the tubing." Since "the tubing can be used as a siphon, utilizing the bulb portion as a primer", the defendant concludes that "when the two independent articles (the pump and the siphon) are integrated, the article which results is much more than either a pump or a siphon." (Defendant's brief, p. 8)

The defendant has cited a number of cases in support of its contention that plaintiff's exhibit 1 is "more than" a "pump", and therefore is not properly classifiable under the *eo nomine* provision for pumps. See *Garrard Sales Corp.* v. *United States,* 35 CCPA 39, C.A.D. 369 (1947) ; *Hirsh & Co. et al.* v. *United States,* 4 Ct. Cust. Appls. 82, T.D. 33365 (1913) ; *Krueger & Hoch* v. *United States,* 2 Cust. Ct. 68, C.D. 88 (1939) ; *Baker Ice Machine Co., Inc.* v. *United States;* 4 Cust. Ct. 22, C.D. 274 (1940). From these and other cases defendant concludes that "the imported article is a *combination* article and consequently is *more than* either. It is an entirety and cannot be classified under a provision which encompasses only a part of its functions." (Defendant's brief, p. 14) [Italics in original.]

Due consideration has been given to the cases cited by defendant on the "more than" principle, as applied to the construction of tariff statutes where the court has held that a joining of two distinct articles in a single unit may constitute the resultant product a separate and distinct article more than either of its components. In the present case, however, in view of the record before it, the court does not deem those cases to be controlling.

The court is of opinion that the argument advanced by the defendant has been met and disposed of in the *Hancock Gross, Inc.* case. The

court, in that case, in considering the contention that the "Drain or Fill" was "more than" a pump, stated as follows:

> "An additional reason urged by defendant for holding that the 'Drain or Fill' is not a pump is that, in addition to the use of the merchandise as a 'venturi-type suction apparatus,' it is capable of use as a conduit for water. In our view, the latter use is incidental or auxiliary to the primary design and function of the article as a pump for liquids. Consequently, this merchandise should be given its claimed *eo nomine* classification notwithstanding the existence of the additional feature of the bell-shaped attachment. Cf. *United Carr Fastener Corporation* v. *United States (Northern Screw Corp., Party in Interest)*, 54 CCPA 89, C.A.D. 913 (1967), aff'g 56 Cust. Ct. 347, C.D. 2648 (1966); *Durbrow & Hearne et al.* v. *United States*, 11 Ct. Cust. Appls. 446, T.D. 39440 (1923); *Durbrow & Hearne Manufacturing Co.* v. *United States*, 9 Ct. Cust. Appls. 148, T.D. 37993 (1919); *Giddings & Lewis Machine Tool Co. et al.* v. *United States*, 61 Cust. Ct. 284, C.D. 3612, 292 F. Supp. 394 (1968); *John Heathcoat & Co., Inc.* v. *United States*, 24 Cust. Ct. 145, C.D. 1223 (1950).

> "In *United Carr Fastener Corporation, supra*, this court stated (id. at 352):

>> 'With respect to [articles having dual or multiple end uses], "the question is not so much what * * * [the imported article] does as what it primarily was constructed and designed to do," insofar as classification of the article is concerned. * * *' "

The reasoning of the *United Carr Fastener Corporation* case, that classification of an article is controlled by what the imported article was constructed and designed to do, was decisive not only in the *Hancock Gross, Inc.* case, and in the numerous cases cited therein, but also in the recent case of *Schick X-Ray Co., Inc.* v. *United States*, 64 Cust Ct. 430, C.D. 4013 (1970).

In the case at bar, there is the unequivocal testimony of Professor Wolf that although exhibit 1 *could be* used as a siphon, within the common meaning of the term, it was *primarily* a pump. When requested on direct examination "to advise the Court whether that device [exhibit 1] has a name by which it would be recognized by a mechanical engineer", Professor Wolf replied: "Yes, that is a pump; in fact, a piston pump."

In light of the foregoing considerations, and on the record here presented, the court holds that the portable siphon pumps in contro-

versy are hand-operated pumps of the kind provided for in item 660.90 of TSUS, as claimed by plaintiff, and should properly have been so classified and assessed with duty at the rate of 12 per centum ad valorem.

Both as to the portable siphon pumps and the automatic drain pumps in controversy, plaintiff's principal or "preferred" claim, for reclassification pursuant to the provisions of item 660.90 of the TSUS, is sustained, and the presumption of correctness attaching to the classification under item 774.60 has been overcome.

Judgment will issue accordingly.